MARCUS M. TOWLE *et al.*

*v.*

FREDERICK AMBS.

*Filed at Ottawa January 19, 1888.*

1. TRUSTS AND TRUSTEES—*when a trust arises—in respect of land conveyed to one to perfect title and sell on joint account.* The owner of land which had been sold under a deed of trust, conveyed the same to another, under a written agreement that the latter should take legal steps to have

the trustee's sale set aside and remove the incumbrance, and then sell the same, and after reimbursing himself for his outlays, account to the former for one-half of the remaining proceeds. The grantee, by a compromise with the purchaser at the trustee's sale, acquired the title free of incumbrance: *Held*, that the person so holding the title thereby became the trustee of his grantor, and that it became his duty, as such, to sell the land for its reasonable value, and after deducting his advances, with interest thereon, pay over to the *cestui que trust* one-half of the remainder of the proceeds.

2. SAME—*fraud on the part of a trustee—in the sale of trust property at inadequate price—remedy of cestui que trust.* A trustee holding the legal title to real estate to be sold for the use of another and himself, is not justified in selling the same at half its real value, and when the purchaser is not a *bona fide* one, the sale will be set aside, in equity, at the suit of the *cestui que trust*. Facts and circumstances stated, from which a sale by a trustee to another, and a sale by the latter, are held fraudulent, and merely colorable, as against the *cestui que trust.*

3. SAME—*loss of compensation by reason of fraudulent conduct.* Where a trustee holding land under a contract is to have an interest in the proceeds of the sale of the same for his services in clearing up the title and in dividing and selling the land, violates his trust, and seeks to dispose of the property for his own use, by making a fraudulent and colorable conveyance at a grossly inadequate price, he will lose all claim to any compensation for his services and all interest in the land.

4. SAME—*rescission of contract, on account of an abuse of the trust.* Where there is gross fraud on the part of a trustee in the execution of a trust growing out of a contract, by his seeking to appropriate the property of his principal to his own use, a court of equity will presume that the contract was made with a fraudulent intent on his part, and will not only set aside the fraudulent acts under the contract, but will rescind the original contract itself, and compel a conveyance to the principal.

APPEAL from the Circuit Court of Cook county; the Hon. CYRUS EPLER, Judge, presiding.

Mr. ALONZO STEPHENS, and Messrs. McCAGG & CULVER, for the appellants:

The decree makes Towle's conduct subsequent to the execution of the trust, work a forfeiture, not only of the contract which created the trust upon which appellee's interest is based, but also of the vested interest in said premises by Towle from parties entirely independent and distinct from any interest of

appellee, and not even referred to in the contract between himself and Towle, the effect of which is to set aside the contract which created the trust, on account of the conduct of Towle subsequent to the creation of the trust. It is a familiar principle that a court of equity will never enforce a forfeiture, (2 Story's Eq. Jur. sec. 1319,) and that a party to a contract can not rescind the same in part and affirm it as to the residue. *Kimball* v. *Lincoln,* 7 Bradw. 470.

A trustee who has an absolute vested interest in one-half of the trust property, can not be deprived of such interest as a punishment for a failure to carry out the trust, but he can be compelled to account to the *cestui que trust* for his share of the trust property.

In *Franklin* v. *Osgood,* 14 Johns. 527, it is held,—first, inadequacy of price, *per se,* is no ground for setting aside a conveyance, unless it be so gross as to be evidence of fraud; second, in judging of the adequacy of price, the condition and circumstances at the time of sale must be regarded; third, it is no objection to a sale by a trustee that it is made to his near relations; fourth, it is sufficient to support a sale by a trustee, that it was made *bona fide,* and for a valuable consideration, and that there was not negligence on his part. It is not necessary to show that he acted with the utmost possible prudence and sagacity.

Mr. JOHN WOODBRIDGE, and Mr. FRANCIS LACKNER, for the appellee:

In trying the question of fairness, the burden of proof rests on Towle. *Ward* v. *Armstrong,* 84 Ill. 154; *Alexander* v. *Roderiquez,* 12 Wall. 323; 3 Greenleaf on Evidence, sec. 253.

The trustee must use the same care in his management of the trust which a man of ordinary skill would use in managing his own property under like circumstances, and is answerable for all losses, deficiencies and injuries which are occasioned

by his affirmative or negative violation of this obligation. See 2 Pomeroy's Eq. Jur. sec. 1070.

A trustee is bound to communicate to his beneficiary any knowledge or information he may have obtained affecting the beneficiary's interest, so far as it is embraced in or depends upon the trust relation. 2 Pomeroy's Eq. Jur. sec. 1077; *Davone* v. *Fanning*, 2 Johns. Ch. 260.

Trustees, for sale, must use every effort to sell the estate under every possible advantage of time, place and publicity. Perry on Trusts, sec. 770.

The trustee should inform himself of the value of the property, if necessary, by the estimate of some experienced person; and if he sells at a grossly inadequate price, it is a breach of trust which affects the title in the hands of the purchaser. *Stevens* v. *Austin*, 7 Jur. (N. S.) 873; *Wormely* v. *Wormely*, 1 Brock. 330; 8 Wheat. 421.

Both Smith and Gostlin purchased with notice of Ambs' rights, because the contract was on record. If they had been *bona fide* purchasers for value, without notice, they could not successfully defend, because they paid but a trifling part of the purchase money. *Roseman* v. *Miller*, 84 Ill. 299; *Baldwin* v. *Sager*, 70 id. 505.

The misconduct of Towle forfeits his right to the benefit of the contract, by which he was to have one-half of the net proceeds. *Blanfelt* v. *Ackerman*, 23 N. J. Eq. 497; *McKnight* v. *Walsh*, 23 id. 148; *Lathrop* v. *Smaller's Exrs.* id. 192; *White* v. *White*, 89 Ill. 461; *Brannan* v. *Strauss*, 75 id. 235; *Oard* v. *Oard*, 59 id. 47; *Jones* v. *Neeley*, 72 id. 449; *Jenkins* v. *Jenkins*, 3 Mon. 329; Perry on Trusts, 602.

As said in *Oard* v. *Oard:* "If the contract can not be referred to any other head of equity jurisdiction, it would be proper to presume that it was made, in the first instance, with a fraudulent intent."

Mr. JUSTICE MAGRUDER delivered the opinion of the Court:

Stated generally, this is a bill filed by appellee, as *cestui que trust,* against the appellants, for the purpose of setting aside, on the ground of fraud, a certain sale made by the appellant, Marcus M. Towle, as trustee, and also for the purpose of compelling the conveyance to appellee by appellants or some of them of certain lands, alleged to have been transferred by Towle and his grantee in violation of the trust. Towle held the title to the land in trust under an arrangement, by which he was to sell it, and, after reimbursing himself for advances of money made by him, was to divide the proceeds of sale equally between himself and appellee. The circuit court found that the disposition of the property by Towle was fraudulent as against appellee, and decreed that the transfers made by Towle and by his grantee should be set aside, and that all the land, except a small portion which had been conveyed to innocent purchasers, should be reconveyed to appellee. It was also decreed, that a certain amount found to be due from appellee upon an account stated should be paid into court for the benefit of appellants as their interests should appear, and that the trust should cease and the interest of appellant, Towle, in the land, so ordered to be reconveyed to appellee, should no longer exist. The decree so entered is brought before us for review by appeal from the circuit court of Cook county.

Stated more in detail, the facts, out of which the contention arises, are as follows:

Prior to July 1, 1879, the appellee had been the owner of an undivided one-half of a tract of eighty-four acres in Cook county situated near the Indiana State line and adjoining the town of Hammond. The other undivided half of the tract was owned by the appellants, Godfrey Snydacker and Bertha Snydacker, his wife. Appellee had borrowed about $4000 from Snydacker Bros., and, to secure the same, had executed a trust deed to Moses Snydacker upon his undivided forty-two acres.

This trust deed was foreclosed and the property was sold by the trustee, Moses Snydacker, on July 1, 1879, to Louis Frank. The trustee's deed to Frank was recorded May 6, 1880. Appellee had no means. Appellant, Towle, was a prominent and wealthy business man of Hammond, a thriving manufacturing town in Indiana bordering on the Illinois State line, and says, that, besides being in the real estate business, he was president of the First National Bank of Hammond, vice-president of the Tuthill Spring Company, proprietor of the Chicago Carriage Company, president of the Chicago Steel Manufacturing Company, president of the Western Salt Association and president of L. D. Latham & Co., a corporation engaged in the construction of railroads. It also appears from the evidence, that appellant, Towle, was a stockholder and director in the corporation, known as George H. Hammond & Co., engaged in the packing business at Hammond and having a packing-house on the State line, and that he continued to be a director therein until 1885, and was the superintendent of George H. Hammond & Co. until the fall of 1883. Appellee was desirous of setting aside the trustee's sale of his land and of recovering back the title from Frank. Towle agreed to help him.

Accordingly, on February 3, 1880, a written agreement was entered into between appellee and Towle, by the terms of which, after reciting the trust deed and trustee's sale above mentioned, "it is agreed that the said Towle shall investigate the said title of the said Ambs, and if the said Towle, after such investigation, should decide that the interest of the said Ambs in said land is in such shape that the incumbrances thereon can be cleared off, and that the title to said land can be perfected, and if, after such investigation, the said Towle should conclude to clear off such incumbrances and perfect said title, then, in that event, the said Ambs agrees and binds himself that he will convey, or cause to be conveyed, to said Towle, his, the said Ambs', interest in said land, whereupon the said Towle shall

proceed to clear the said land of incumbrances, and perfect the title thereto, and sell, dispose, or make such use of such land, as he, said Towle, may see proper; but in case of said conveyance the said Towle shall take out of the first proceeds of said land all the money paid or spent by him in clearing off said incumbrances, and in perfecting said title, and in making and causing to be made all investigations of said title, and all his other expenses in connection with the handling of said land; and after all such payments by the said Towle, the residue of the proceeds of said land shall be equally divided between the said parties." This contract was recorded in the recorder's office of Cook county on October 20, 1880.

On April 10, 1880, Towle, having decided that the title to the land could be perfected, executed under his hand and seal to appellee a bond, the condition of which is as follows:

"The condition of the above obligation is such, that whereas the said Frederick Ambs has this day sold to Marcus M. Towle, the above obligor, the undivided one-half part of the north half of the south-east fractional quarter, and the north-east fractional quarter (lying south of the Grand Calumet river) of section 8, town 36 north, range 15, east of the third principal meridian, in Cook county, Illinois, which said sale is made subject to one certain trust deed to Moses Snydacker, which said Marcus M. Towle will endeavor to pay and redeem from any sale which may have been made under said trust deed; and if such redemption is made, said Marcus M. Towle will hold the aforedescribed land, and will make a sale thereof so soon as he shall, in his judgment and discretion, deem best, and will account to and pay over to the said Frederick Ambs an undivided one-half of the proceeds of the sale of the before mentioned land, after deducting therefrom all and every part of the money paid by said Marcus M. Towle for the redemption of said land from the aforesaid trust deed, with the interest thereon from the date of payment until the repayment thereof by such sale, at the rate of eight per cent per annum,—it being

hereby expressly agreed and understood that this bond is only for an accounting, and that it is not intended hereby to convey, or agree to convey, any interest whatever in the within described land."

On the same day, April 10, 1880, appellee executed a deed to Towle conveying to him the undivided half of the eighty-four acre tract for an expressed consideration of $4000, which deed was recorded June 1, 1880.

On June 8, 1880, Towle filed a bill against Frank and the Snydackers to set aside the sale under the trust deed, making Ambs a co-complainant with himself in the bill. The suit so begun was settled before it came to a hearing. The settlement took place on July 22, 1881; by the terms of it Towle paid Frank or the Snydackers $7000 and received from Frank a deed to the premises.

Thus, on July 22, 1881, by the deeds from appellee and from Frank, Towle had become the holder of a clear unincumbered title to the property in question, and appellee owed him at that date, for advances made, the $7000 paid to Snydacker, and about $129 laid out for taxes, costs, etc. After this date it was the duty of Towle to sell the land, and, after deducting his advances and eight per cent interest thereon, to pay over to appellee one-half of so much of the proceeds of the sale as should remain.

After holding the title for over three years Towle and his wife made a deed of the land on October 2, 1884, to one Charles C. Smith, which deed was recorded on October 6, 1884. The consideration named in the deed was $14,000. Smith says that he paid $2000 in cash, assumed a mortgage of $5000, which Towle had given on the premises to Snydacker, and executed a mortgage to Towle to secure $7000 in notes, three of the notes being each for $2000 and payable in one, two and three years respectively, and one of them for $1000 payable in four years. The mortgage for $7000 was recorded on October 6, 1884.

On November 19, 1884, Smith and wife executed a deed, conveying the land to William H. Gostlin for an expressed consideration of $14,500, which deed was recorded November 24, 1884. Gostlin says, that he assumed the two mortgages above named of $5000 and $7000 respectively, and paid Smith $500 in cash and gave him his note for $2000 payable in sixty days.

On November 25, 1884, six days after Gostlin obtained the title, he and Snydacker, who owned the other undivided half of the eighty acre tract, sold five acres to George H. Hammond & Co. for $7500, or at the rate of $1500 per acre. In May, 1885, Gostlin and Snydacker sold one acre and a half to Mayer & Dracket for $3800, or at the rate of $2500 per acre. The decree of the circuit court, rendered on March 29, 1887, recognizes the validity of the two sales last named, amounting to six and one-half acres out of the whole tract, or three and one-fourth acres out of the land in dispute. In the accounting between appellee and appellants, appellee was given credit for $3750, one-half of the $7500, and for $1900, one-half of the $3800, and these credits with interest thereon were applied in appellee's favor in ascertaining the amount decreed to be paid into court for appellants, so that, as we understand the matter, neither party questions, upon this appeal, the *bona fides* of the sales by Gostlin to George H. Hammond & Co. and Mayer & Dracket. We understand, that the balance of the undivided forty-two acres, after taking out the three and a quarter acres above mentioned, is still held by the appellant Gostlin.

The appellant Towle admits, that he held the property in trust and was bound to account to appellee for one-half of the proceeds of sale after taking out his advances, but he claims that he sold the property to Smith for $14,000 and that he should be allowed to settle with appellee upon the basis of that sale.

On the other hand, it is contended by appellee, that the transfers from Towle to Smith and from Smith to Gostlin were not *bona fide* sales, but that they were mere colorable transfers made for the purpose of defrauding appellee, and that Towle continued to be the real party in interest after his deed to Smith and after Smith's deed to Gostlin. The circuit court found for appellee, the complainant below, upon this point, and we think the finding was correct.

In the first place, the property was deeded to Smith at about one-half of its real value. At $14,000 for the whole interest the property was conveyed to Smith on October 2, 1884, at about $350 per acre. The testimony shows, that it was then fairly worth $750 per acre, or about $28,000. In less than two months after it was deeded to Smith, two and a half acres of it were sold for $1500 per acre, and in about six months thereafter three-quarters of an acre of it was sold for $1900.

Appellants insist, that the sales to George H. Hammond & Co. and to Mayer & Dracket can not be regarded as fair criterions of value. It is said, that George H. Hammond & Co., whose packing-house adjoined the land in controversy, had encroached upon it, and had built upon it valuable improvements costing many thousands of dollars, and that Snydacker had written letters to Mr. Hammond, the president of the company, threatening to dispossess him by suit and to bring actions for trespass and for cutting ice from the river, etc., and that, in consequence of all this, the company was forced to pay a large price. It is also said that Mayer & Dracket were running a pavilion or dance-house on the Indiana side of the line, next to the land in controversy, and that they needed more room, and bought the acre and a half on the Illinois side, because they could sell beer in Illinois on Sunday, which they could not do in Indiana, and because they could get license to sell liquor cheaper in Illinois than in Indiana. It may be true, that the considerations here presented may have induced the Hammond Co. and Mayer & Dracket to pay more

for that portion of the tract which they bought, than the balance of it could have been sold for to other parties. But we do not think, after a careful examination of the evidence, that these considerations account for the large difference between $350 per acre and $2500 per acre, or even between $350 per acre and $1500 per acre.

All the witnesses for appellee, who place the value at $750 per acre and who. are less interested than many of the witnesses for appellants, associated as the latter are with appellant Towle in his various enterprises in and about Hammond, do not base their estimates upon the sales to the Hammond Co. and Mayer & Dracket. Some of them base their valuations upon actual purchases made by themselves of neighboring lots. The tract in question was situated between Hammond, a place of 2500 or 3000 inhabitants, on the east, and West Hammond on the west, where there was a subdivision called Freitag's subdivision, on which some forty or fifty houses had been built. South of it was Russell's subdivision, and, on the north, it had a frontage of sixteen hundred feet on the Calumet river. It was adapted for subdivision into lots and for sale in lots to the workingmen engaged in the packinghouses and various manufactories adjoining it and in its vicinity. Years before Towle took hold of it, appellee and Snydacker had made a subdivision of it and had sold several lots out of it. Mr. Hammond, a partner and business associate of Towle and not disposed to favor appellee, says, that he offered appellee $1000 per acre for the five acres in September, 1884, and that the value then and in October, 1884, was $1000 per acre. He had known the Ambs tract for eighteen years and had been identified with Hammond from its foundation. Snydacker says, that he was offered $20,000 for his half of the eighty acre tract in October, 1884, and refused it, and that, in his opinion, it was then worth $30,000.

Therefore, if the transfer to Smith had -been a real sale, Towle was not justified in selling for $14,000 a piece of trust

property, which was worth $28,000. Even if there were special reasons, why the purchasers of the three and one-quarter acres were forced to pay a large price for them, appellee was as much entitled to the benefit of those reasons as was the appellant, Towle.

In the second place, the conclusion is irresistible from all the facts and circumstances developed in the testimony that Smith and Gostlin were not *bona fide* purchasers of the property.

Smith and Towle were brothers-in-law; their wives were sisters. Smith had been working for George H. Hammond & Co. for twelve or thirteen years. In 1884 he was receiving a salary of about $20 per week. He had been in Hammond over fifteen years and, three or four years after he went there, married the appellant, Mary D. Smith. She was Mrs. Towle's sister and then lived in Towle's family and did the housework. When she went to the "State Line," where the town of Hammond afterwards sprung up, Towle was in the butcher business with Hammond, and the firm was Hammond, Plummer & Co. A store was started, which Mrs. Smith seems to have attended to for Towle and to have had some interest in. Towle appears to have bought the goods for the store and they were shipped to Hammond, Plummer & Co. Towle boarded the butchers and the meat and groceries for them came from the store. The store was built on ground belonging to Hammond, Towle's partner; the goods originally were bought in the name of Hammond, Plummer & Co.; the bills were paid by Towle.

It is claimed, that Smith paid $2000 in cash to Towle and assumed mortgages for $12,000. He paid nothing on the mortgages. When asked where he obtained the $2000, he says that he received it from his wife; when asked how his wife came by the $2000, he says she got the money from Towle upon a note she held against him. Thus, the money which Smith paid to Towle came from Towle himself. Mrs. Smith claims to have owned an interest in the store, although

the books do not show it. She says that she drew out of the business $2000, which she did not need and let Towle have it and he gave her the note for it. The books show no such amount drawn out, nor do they show any such amount repaid by Towle. Towle's books, though full of details as to his other business, contain no record of the $2000 paid by him to Mrs. Smith or received by him from Mrs. Smith. A ledger of M. M. Towle, a book in the store, was produced on the trial. It shows an account with C. C. Smith running from January, 1881, to March, 1883, from which Smith appears to have been indebted to Towle $6125.12. It is said that this was Mrs. Smith's account; if so, it contains no credit for the $2000 paid to Towle. It is difficult to understand why, if this large amount was due from Mrs. Smith to Towle, it did not off-set the amount due on the note. Towle was in the habit of conveying property to Smith and his wife, and if there was any real consideration for these conveyances, none of the books of any of the parties show anything upon the subject. The testimony of Mrs. Smith and of Towle is contradictory in reference to many of these transactions. Mrs. Smith says, that Towle was her partner and her banker and paid all her bills. Towle says he paid her the $2000 in currency, and she says that she kept this currency in the house until she paid it to her husband, who handed it back to Towle.

We are satisfied from the relations, which existed between Towle and Smith and his wife, that the store in question, whatever interest Mrs. Smith may have had in it as a consideration for looking after it, was in reality Towle's store, that the capital invested in it was Towle's, and that the $2000 paid by Smith on the land came from Towle himself through the store. Moreover, Smith took his deed for the land in question, on the very next day after he and Towle concluded the arrangement, without demanding any abstract of title, or examining into or inquiring about the title. He was about this time foreman of the slaughter house of George H. Ham-

mond & Co., in which Towle was a director, and paid $2000 in money and gave notes and a mortgage for $7000 without knowing or seeming to care whether he was receiving any title or not. He knew that the improvements of the corporation he was working for encroached upon the property when he received his deed. Before he conveyed to Gostlin, he was informed by Snydacker that the property was worth $1500 per acre, and yet he suffered Gostlin to take it for about $350 per acre.

As already stated, Smith deeded the land to Gostlin on November 19, 1884. Gostlin assumed the same mortgages which had been assumed by Smith, and says, that he paid Smith $500 and gave him his note for $2000 payable in sixty days. There was a "still business" carried on at Hammond by the M. M. Towle Distilling Company. The stock of this corporation was $80,000, and Towle owned $60,000 of it. Gostlin was interested in this distillery with Towle. He had put in some machinery that he brought from Crystal Lake. He was paid a salary of $2000 by the distilling company, and had an interest of one-fourth in the profits after deducting his salary. He was a man of very little means, and the lots he had in Hammond seem to have been conveyed to him by Towle and his partner. He acted as overseer for Towle, while the latter was rebuilding his carriage works.

When Gostlin took his deed from Smith he demanded no abstract of title and made no examination as to the title. His negotiation with Smith was closed in fifteen minutes, and the $500 were paid and the deed was delivered on the same day, on which the negotiation took place, or on the next day thereafter. He says that he paid the note for $2000 which he gave to Smith with the proceeds of the sale of two drafts he had received from California from the sale of an interest in a vinegar factory there, and that these drafts were cashed for him by Towle. Smith says that, as soon as he received the $2000 from Gostlin he "put it in the business west—in an interest

in a ranch." He states that he and Towle owned a ranch in Kansas, he having bought a quarter interest from Towle, and the $2000 went at once into this ranch. It thus appears that the money Gostlin paid to Smith was applied to the use of one of Towle's business enterprises.

After the property was deeded to Gostlin, some improvements were made on it; twenty-three acres of it were graded by one Weeks in the summer of 1885. Towle had a general store, consisting of groceries and dry goods at Hammond. Weeks was paid for his work by orders for goods drawn on Towle's store. These orders were accepted and paid by Towle; they were first charged to Weeks on the books of Towle, then credited to Weeks on account of the labor performed by him; the books were balanced by charging the amount credited to Weeks to Towle's private account. There was no charge to Gostlin on the books. In other words, the evidence shows that in 1885 Towle was paying for the improvement of property, which is claimed to have been sold to Gostlin in 1884. Within a day or two before these books were produced upon the trial in the court below, it is proven beyond contradiction that some of the entries had been tampered with. For instance, before the item: "E. E. Weeks $100," were written the words: "By W. H. Gostlin for," so as to make the entry read: "By W. H. Gostlin for E. E. Weeks, $100." There was no other evidence in the books, that Gostlin had had anything to do with the payments to Weeks.

There are many other items of testimony, which we can not comment upon without making this opinion too long. We are satisfied from a careful examination of all the evidence that Smith and Gostlin were made use of by Towle as mere covers for the purpose of carrying out a fraudulent scheme to deprive appellee of his full interest in this property.

It is contended on the part of the appellants, that, even if the transfers to Smith and Gostlin are set aside as to all the land except the three and one-quarter acres sold to innocent

purchasers, yet Towle still has a right to claim one-half of the proceeds of the sale of the land undisposed of by Gostlin, on the ground that whatever fraud Towle may have been guilty of was not in obtaining the title from appellee and Frank, but in his subsequent efforts to sell the property. It is claimed, that the original contract between Towle and appellee was without fraud and fairly made, and that, therefore, Towle should not be deprived of his interest in that contract because of a fraud practiced by him subsequently to its execution. In other words, appellants insist, that, when Gostlin surrenders the portion of the property, to which he still retains title, such property falls back into the original trust and becomes subject to the provisions thereof, and that either Towle himself or some trustee appointed in his place should proceed to sell the property and divide the proceeds of the sale between appellee and Towle. The decree of the court below, while allowing to Towle or to Towle and Gostlin all their advances and expenditures together with interest thereon, directs a reconveyance of the remaining property to appellee freed from any interest of Towle therein. We think the decree in this regard was right.

The interest, which Towle was to have, under the contract, in the proceeds of the sale of the property, was to be his compensation for services as agent or trustee in clearing the title and selling and dividing the land. So far as the selling and dividing were concerned, he violated his trust and sought to dispose of the property for his own use and not for the use of the *cestui que trust.*

There are instances, where an agent or trustee, who fraudulently appropriates the property of his principal, will not be allowed any compensation. There are also cases, where, when there is gross fraud in the carrying out of a trust imposed by a contract, a court of equity will presume that the contract was made in the first instance with a fraudulent intent on the part of the guilty party, and will not only set aside the fraudulent acts under the contract, but rescind the original contract

itself. (*Frazier* v. *Miller*, 16 Ill. 49; *Oard* v. *Oard*, 59 id. 47; *Jones* v. *Neely*, 72 id. 449; *Brannan* v. *Strauss*, 75 id. 235; *White* v. *White*, 89 id. 461.) We think the conduct of the appellant Towle was such a gross abuse of his trust as to justify a rescission of the agreement between himself and the appellee.

*First*, between February 3, 1880, and the fall of 1884 and while he was superintendent of George H. Hammond & Co. and a director thereof, he permitted that corporation to make extensive improvements, consisting of an ice house, repair shops, side-tracks, a brick well costing $1500, etc., upon the trust property without consulting appellee or accounting to him for rent or for ice taken from the river.

*Second*, on July 3, 1883, he borrowed $5000 for three years at seven per cent interest from Snydacker, and to secure the loan gave Snydacker a mortgage upon the trust property. This money he used for himself in his own business. He never consulted appellee about making the loan nor informed him of it. Such a large mortgage covering the whole property was calculated to delay and interfere with its sale in lots and thereby prevent its sale in the mode which would realize the largest prices.

*Third*, in the spring of 1884 appellee called on Towle in company with one Stauhlbaum and asked Towle to buy his interest in the land and tried to make some arrangement to sell out to his trustee. On that very day Towle held a consultation with his lawyer about instituting a proceeding to have appellee declared a lunatic and to have a guardian or conservator appointed for him. Shortly thereafter and on April 29, 1884, Towle filed a petition in the circuit court of Lake county, Indiana, charging that appellee was of unsound mind and incapable of managing his estate, and asking for a trial and the appointment of a guardian. The summons in this proceeding was served on appellee on April 30, 1884. The proceeding was dismissed November 18, 1884, re-instated

December 1, 1884, and dismissed again December 8, 1885. Towle preferred dealing with a guardian rather than with appellee himself.

*Fourth*, appellee repeatedly urged Towle to sell the property after July 22, 1881, and Towle constantly and steadily refused to take any steps in that direction. Ambs swears—and the conduct of Towle and all the facts and circumstances of the case tend to confirm him—that Towle claimed the property as his own and to have purchased it from Snydacker.

*Fifth*, when Towle deeded the property to Smith on October 2, 1884, he never informed appellee that he intended to do so, or that he had done so, nor did he consult him at all about such transfer. Appellee never learned of the conveyance to Smith until long after it was made, and, when he inquired of Smith what he had paid for the land, Smith refused to tell him.

Appellant, Towle, seeks to explain his failure to report to appellee the fact of the alleged sale to Smith by the statement that he had been garnisheed in a suit against appellee, and could not settle with him until such garnishee proceeding was ended. The judgment in that proceeding, which was not paid by Towle until 1885, was for only about $1400. If the transfer to Smith had been a *bona fide* sale, Towle had money and notes enough in his hands to have reimbursed himself for his outlays and to have secured himself for the amount, for which he had been garnisheed; and, after all this had been done, there was still a balance in his hands in notes or money, which he could have divided with appellee and which it was his duty to have divided with appellee. Therefore, the garnishee suit was no excuse for his not reporting the Smith sale to appellee and dividing its proceeds with him, if, as is claimed by him, there was a sale to Smith.

*Sixth*, in addition to all the other evidences of bad faith in this matter, we are satisfied from the evidence, that before the appellant, Towle, deeded the property to Smith, he knew that

five acres of it could be sold to George H. Hammond & Co. for $1000 or $1500 per acre, and he put the title into the hands of Smith and Gostlin, in order that he and they, and not appellee, might receive the benefit of such sale of the five acres.

The record presents such an outrageous attempt on the part of a rich and powerful man to defraud and crush his ignorant and poor neighbor, that it would be a mockery of justice to do otherwise than affirm the decree of the circuit court. Such decree is accordingly affirmed.

*Decree affirmed.*

Mr. CHIEF JUSTICE SHELDON dissents from so much of the decree as inflicts upon Towle the penalty of a forfeiture of his one-half interest in the land, not perceiving upon what legal principle the appellee was entitled to such forfeiture.

Mr. JUSTICE SHOPE : I concur in the dissent of SHELDON, C. J.