James P. HOFFA

v.

Frank E. FITZSIMMONS and Ray
Schoessling, Appellants.

James P. HOFFA, Appellant,

v.

Frank E. FITZSIMMONS, et al.

Josephine HOFFA

v.

Frank E. FITZSIMMONS, et
al., Appellants.

Nos. 80–2350, 80–2400 and 80–2535.

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 13, 1981.
Decided March 26, 1982.

Robert J. Higgins, Washington, D. C., with whom George Kaufmann and Charles W. Saber, Washington, D. C., were on brief, for Fitzsimmons and Schoessling, appellants in Nos. 80–2350 and 80–2535 and cross-appellees in No. 80–2400.

Samuel J. Buffone, Washington, D. C., with whom Michael E. Tigar and John J. Privitera, Washington, D. C., were on brief, for Hoffa, appellee in Nos. 80–2350 and 80–2535 and cross-appellant in No. 80–2400.

Before WRIGHT, TAMM and EDWARDS, Circuit Judges.

Opinion for the court filed by Circuit Judge TAMM.

TAMM, Circuit Judge:

We are called upon to rule in this case on a variety of difficult questions involving the interrelationship of the laws of contract and trust. At stake is the interest of the estate of James R. Hoffa in the pension fund established by the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America (Teamsters) for the benefit of certain officers and employees of the union. When Hoffa retired from the employ of the Teamsters in 1971, an agreement was entered into that purported to specify the amount to which he was entitled under the pension plan. The instant litigation concerns the enforceability of that document. The district judge ruled that Hoffa's estate could enforce the agreement and was accordingly entitled to damages for its breach. We agree with the district judge that the representatives of the Hoffa estate are entitled to enforcement, and we therefore agree that summary judgment in favor of the estate was appropriate; we grant such disposition on a ground slightly different, however, from that employed in the district court. We also differ slightly in the provision of an appropriate remedy to the Hoffa estate, although this matter is, as will be apparent below, of no great moment. Although we remand the case, the proceedings to follow in the district court will be mercifully brief.

## I. THE FACTUAL BACKGROUND

The facts of this case, though complicated, are not in dispute. James R. Hoffa[1] began in 1932 what was to be nearly a forty-year career of service with the Teamsters. Rising through the ranks, Hoffa became general president of the union in 1957, a position to which he was re-elected in 1961 and 1966. His career was not one unmarred by controversy; in 1964 Hoffa was convicted of two felonies, and in March of 1967 he entered the federal penitentiary at Lewisburg, Pennsylvania, to serve the resulting aggregate sentence of thirteen years. *See Hoffa v. Saxbe*, 378 F.Supp. 1221, 1223 (D.D.C.1974).

On June 19, 1971, while still incarcerated, Hoffa resigned as the head of the Teamsters. As the district judge noted, Hoffa's decision not to continue his jailhouse supervision of the union appears to have been prompted by several factors, including (1) pressure from the Teamsters' Executive Board, (2) his desire to receive the benefit of significant accrued pension rights payable on retirement, and (3) the possibility that withdrawal from active involvement in Teamsters activities might enhance the likelihood of his early departure from the cramped confines of Lewisburg. *Hoffa v. Fitzsimmons*, 499 F.Supp. 357, 359 (D.D.C. 1980). At the time of his resignation, Hoffa and other officers and employees of the International Union were the beneficiaries of the employer-maintained pension plan known as the Retirement and Family Protection Plan for Officers and Employees of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America (the Plan).

Under provisions of the Plan in 1971,[2] a beneficiary in Hoffa's position[3] had the unilateral option of taking his retirement benefits in one of two ways: he could either receive a lifetime annuity in an amount representing 100 percent of his average annual salary during the five-year period preceding retirement, or he could receive a single lump sum "Cash Termination Benefit" representing the estimated actuarial reserve necessary to fund the annuity to which he would otherwise have been entitled.[4] Shortly before Hoffa's resignation and retirement, his personal attorney entered into discussions with the trustee and administrators of the Plan with regard to Hoffa's rights under it. Hoffa elected to take the lump sum benefit option upon his retirement, and a written Agreement for Deposit (Agreement) was signed that reflected the understanding of the parties regarding Hoffa's entitlement under the Plan.[5]

---

**1.** The present whereabouts of Mr. Hoffa are, of course, unknown. The former union president disappeared on or about July 30, 1975, and is considered a missing person by law enforcement authorities. Hoffa's wife Josephine was appointed the administratrix of his estate in 1976, *see* Letters of Authority Issued to Josephine Hoffa, Joint Appendix (J.A.) at 20, and she pursued the instant action. During its pendency she died and has been succeeded by her son, James P. Hoffa, as administrator. For ease of reference, however, we will refer to James R. Hoffa as the party of record in this litigation.

The procedural posture of this case makes it a bit difficult to sort out the parties by use of the traditional labels. For ease of reference, we will subsequently refer to Mr. Hoffa as the appellee in light of the success of his estate in the district court. Correspondingly, the appellants in the current action are the late Frank Fitzsimmons, the former chairman and representative of the Administrative Committee of the pension plan, and Ray Schoessling, the present trustee of that plan.

**2.** A full text of the Retirement and Family Protection Plan for Officers and Employees of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America (the Plan) as in effect in 1971 is set out in the Joint Appendix at 111–22.

**3.** The Plan provided that a beneficiary could qualify for pension benefits without reduction in the amount of the accrued annuity balance either by reaching his "Normal Retirement Date" or by fulfilling the conditions for the "Twenty-Year Service Retirement Benefit." *See* Plan Articles VII and VIII; J.A. at 115–16. Although Hoffa retired before his "normal" date, he qualified for the twenty-year benefits in light of his long service.

**4.** *See* Plan Article VIII, ¶¶ 11, 12; J.A. at 117–18.

**5.** The parties to the Agreement for Deposit (Agreement), which is set out at J.A. 25–35, included Mr. Hoffa, the Plan's trustee Thomas

In electing to receive the lump sum benefit, Hoffa relied in large measure on the calculation by the Plan's actuary of the actuarial reserve balance that obtained in his case. Each year from 1961 until 1969, the Plan's administrators had delivered to Hoffa an annual statement that reflected his accrued actuarial reserve. The last such statement indicated that, as of June 30, 1969, Hoffa was entitled to roughly $1.61 million as a lump sum payment.[6] When Hoffa ultimately retired, the Plan's actuary determined that Hoffa was entitled to receive $1,745,141.21[7] as a lump sum benefit. The trustee and administrators of the Plan concede that the actuary acted in good faith in arriving at this figure and that in so doing he followed the then-prevailing interpretations of the Plan.[8] In preparing the Agreement, Hoffa's attorney based its financial terms on the sum supplied by the actuary, and the attorney stated that he accepted without further question the accuracy of the 1971 calculation in light of its apparent proportionate accordance with the annual figures for 1961 to 1969.[9] The Agreement stated that the trustee and administrators warranted that the amount listed as Hoffa's entitlement was "the correct amount due Hoffa under the Plan"[10] and that the document as a whole was a "binding and enforceable contract ...."[11]

Because of certain restrictions on pension plan activity however, Hoffa could not immediately receive the entirety of his benefit at the time of his retirement. Section 401(a)(4) of the Internal Revenue Code, 26 U.S.C. § 401(a)(4) (1970), and implementing Treasury Regulations §§ 1.401–4(a)(1) and (c)(1), 26 C.F.R. §§ 1.401–4(a)(1) and (c)(1) (1971), proscribed in 1971 and proscribe in similar form today qualified pension funds from discriminating in favor of highly paid officials at the expense of the members of the rank-and-file. These Treasury restrictions, which are designed to ensure the integrity of the particular pension arrangement, were incorporated in similar form by the Plan in its Article XII. Greatly summarized, in order to maintain a tax-exempt status, a pension plan could not and may not pay in an unrestricted fashion large lump sum termination benefits when the recipient is an officer or one of the twenty-five most highly paid employees of the employing entity; rather, Treasury Regulation § 1.401–4(c) requires in such cases that portions of the sum be "restricted" for a specific period to ensure the capacity of the fund to meet other pension obligations.

Among the terms included in the Agreement were provisions intended to guarantee compliance with the Treasury norms. Under the arrangement worked out between Hoffa and the Plan, the entire sum due Hoffa was to be paid him on condition that the restricted amounts, as determined by the Plan, were placed in an escrow account with a third-party depository bank.[12] The escrow arrangement was entered into, as counsel for the Hoffa estate contend, solely to comply with Treasury Regulation § 1.401–4(c);[13] on the other hand, the third-party escrow agent was employed, as counsel for the Plan note, solely to ensure that

---

E. Flynn, and the members of the Plan's Administrative Committee. The American Security and Trust Company, a District of Columbia banking institution, was a party because of the Agreement's escrow provisions. *See* notes 12 & 13, *infra*, and accompanying text.

6. *See* Letter of August 6, 1969, from Thomas E. Flynn to James R. Hoffa; J.A. at 249.

7. J.A. at 198.

8. Brief for Appellants at 7–8.

9. Affidavit of Stanley M. Rosenblum at p.2, ¶ 7, *Hoffa v. Fitzsimmons,* 499 F.Supp. 357 (D.D.C. 1980); J.A. at 217.

10. Agreement ¶ 1; J.A. at 26.

11. Agreement ¶ 27; J.A. at 34.

12. The American Security and Trust Company agreed to serve as the depository of the restricted funds. As the district judge noted, the bank was originally named as a defendant by Hoffa; in Hoffa's amended complaint, however, the bank was dismissed as a party, and the district court later entered an order confirming that dismissal. *Hoffa v. Fitzsimmons,* 499 F.Supp. at 360 n.8. The bank still holds the restricted amounts.

13. *See* Brief for Appellee at 10.

favorable tax treatment would inure to Hoffa's benefit.[14]

The Agreement thus provided that Hoffa was to be paid a lump sum termination benefit of $1,745,141.21 and in turn required that Hoffa deposit the restricted portion, or an acceptable substitute, with the escrow bank. The administrators of the Plan, relying on their actuary's determinations, concluded that the government regulations required that $650,070.31 of the $1.75 million be restricted, and the Agreement incorporated that conclusion. It was also determined by the administrators and Hoffa's representative that it was necessary to release the escrowed amount in two installments; thus, the Agreement provided that roughly $190,000 was to be released as a first installment on July 1, 1974, and that the remaining $460,000 would be given Hoffa on January 1, 1976.[15] Although the specific details are somewhat complex, the essence of the Agreement's escrow provisions was that the Plan's trustee and Administrative Committee were to authorize the bank to release the installments upon their determination that the lump sum payment conformed with the applicable Treasury regulations.[16]

The parties specified that the Agreement was fully integrated and that it was intended to delineate the rights and duties of the signatories as of June 19, 1971. Given his accommodation status at Lewisburg Penitentiary, Hoffa was unable to attend the closing of the Agreement on June 24, 1971; his son, however, acting under a power of attorney, accepted a check from the Plan and in turn deposited the restricted amount in the escrow account. All went like clockwork when it came time to consider release of the first installment in 1974; the Plan's trustee and Administrative Committee determined on July 1, 1974, that the lump sum distribution conformed with regulation § 1.401–4(c), and accordingly authorized the bank to release the first amount. The bank complied.

In 1975, fully a year before the remaining installment was to be released, the Internal Revenue Service (IRS or Service) entered the picture and clouded the tax-exempt status of the Plan. In that year the IRS rejected the Plan's interpretation of its own provisions as reflected in the Agreement; the IRS concluded that Hoffa was entitled to receive in total only $1.11 million.[17] Despite its "vigorous" defense,[18] the Plan was unable to persuade the IRS that the actuary's 1971 construction of the Plan was correct. In light of the enormous tax costs that would result if the Plan failed to acquiesce in the Commissioner's ruling, the trustee and the Teamsters union concluded a settlement agreement with the Service. As part of that settlement, the trustee agreed to accept the IRS interpretation of the Plan, to deny release of the second escrow installment, and to take such actions as might prove necessary to recover the

---

14. *See* Brief for Appellants at 8–9.

15. Agreement ¶ 8; J.A. at 29. The actual amounts of the restricted sums were $188,-934.14, and $461,136.17, respectively. *Id.*

16. To that end, the trustee and Administrative Committee agreed to deliver a certificate to the escrow bank authorizing release of the restricted sums if no determination was made that the original lump sum payment was inconsistent with the Treasury anti-discrimination regulations. Agreement for Deposit ¶ 12; J.A. at 30.

17. The Internal Revenue Service issued in 1975 a "Technical Advice Memorandum" that took issue with the actuarial methods employed by the Plan's actuary in 1971 and that concluded that the "correct" amount due Hoffa was

$1,109,733.91. *Hoffa v. Fitzsimmons*, 499 F.Supp. at 364 & nn.27 & 28. Although not significant in the current context, the Service took issue with the actuary's choice of the date at which the actuarial reserve was to be calculated. The Plan's actuary chose a date in 1967 when Hoffa ceased receiving his salary; the Service alleged that the proper date was his June 1971 separation date. Determination as of this latter date results in a smaller benefit, as the 1971 actuarial reserve would reflect Hoffa's decreased life expectancy as of the later time. *See* Internal Revenue Service, National Office Technical Advice Memorandum at 3–4; J.A. at 158–59.

18. Brief for Appellants at 10.

overpayment to Hoffa that had allegedly already been made.[19]

In accordance with the IRS settlement, the administrators of the Plan, two weeks before the second escrow was to be released on January 1, 1976, instructed the bank [20] not to release the last installment payment. On December 26, 1975, just five days prior to the date of scheduled release, Hoffa's representatives demanded that the Plan direct the bank to surrender the remaining escrowed amount. When the Plan administrators refused, this action ensued.

Appellee Hoffa's complaint, as finally amended, asserted four claims, one of which he voluntarily dismissed.[21] The first count sought specific performance of the terms of the Agreement requiring the Plan's administrators to direct the depository bank to release the remaining escrow funds. Count III, which the district judge correctly noted was "closely related" to Count I,[22] sought damages for the alleged breach by the Plan of the express warranties contained in the Agreement regarding the total amount due Hoffa. Count IV alleged that the Plan inaccurately computed the amount of Hoffa's lump sum benefit and that Hoffa was in fact entitled to over $450,000 more than the amount specified in the Agreement. By way of counterclaim, the Plan's administrators sought the recovery of the alleged overpayment made to Hoffa because of the confusion centering on the proper construction of the Plan.[23]

The district judge disposed of the case on cross-motions for summary judgment made by the parties. Hoffa sought summary judgment on the third count of his complaint, while the present appellants sought judgment in their favor on all three of the remaining counts of Hoffa's complaint and on their counterclaim. Rejecting the challenges to the Agreement proffered by the Plan's trustee and administrators, the district court held that the Agreement was a valid and enforceable contract and that appellants were obligated to adhere to its terms regardless of the allegedly incorrect construction of the Plan on which it was based. Appellants' counterclaim was dismissed in light of the dispositive nature of the Agreement. This appeal followed.

## II. ANALYSIS

Appellants renew in this court a number of arguments made in the district court and there rejected. As the district judge noted,[24] the core of appellants' position is simply stated: they argue that the 1971 calculation of the lump sum benefit due Hoffa was incorrect and that the Agreement should not be enforced to accord Hoffa benefits in excess of those to which he was entitled. The district judge accepted Hoffa's assessment of the governing law and ruled that, regardless of whether the 1971 calculation was in error,[25] the Agreement was binding on the Plan. Thus, even if we assume that Hoffa was overpaid by the terms of the Agreement as contrasted with

**19.** Brief for Appellants at 11; *Hoffa v. Fitzsimmons*, 499 F.Supp. at 364.

**20.** As the district judge noted, this instruction was not based, as envisaged in the Agreement, on any determination that the lump sum payment conflicted with any Treasury regulations. *Id.* at 361 n.10.

**21.** Appellee, as plaintiff in the district court, contended in Count II of the second amended complaint that appellants had willfully misrepresented the amount of Hoffa's proper lump sum benefit. Appellee voluntarily dismissed this count. *See id.* at 361 n.11.

**22.** *Id.* at 361.

**23.** *See* p. 1351 & n.17, *supra*.

**24.** *Hoffa v. Fitzsimmons*, 499 F.Supp. at 361.

**25.** The trial judge made no determination of the amount "actually" due Hoffa under the "proper" construction of the Plan. Rather, it was his position that the warranties in the Agreement bound appellants irrespective of any divergence of the sums in that document with Hoffa's "actual" entitlement. Appellants accordingly argue that we should remand the case for a determination of whether such a divergence exists and that, if it does, the terms of the Plan should prevail. It is quite clear that the validity of the district judge's summary resolution of the case *without* a determination of what the terms of the Plan actually called for Hoffa to receive depends on the legal effect of the commitments contained in the Agreement.

the provisions of the Plan, the dispositive question we must face is the efficacy of the Agreement. Put most simply, appellants would have us disregard the warranties in the Agreement as null, while appellee prays for their enforcement.

The determination of the legal effect of the Agreement is helpfully subdivided into two levels of consideration: on one hand, there is the overriding question of whether an agreement such as this one can ever be effective where arguably inconsistent with the provisions of the trust instrument on which it is based. Secondly, assuming that such a "variation" is acceptable as a matter of theory, we must determine whether this particular agreement is a binding and enforceable contract. Appellants argue in this regard that: (1) the Agreement is voidable because of a mutual mistake of material fact; (2) enforcement of the Agreement by Hoffa would constitute a violation of his fiduciary obligations to the Plan; and (3) the Agreement is voidable because of a lack of consideration flowing from Hoffa. Finally, appellants contend that, even if the Agreement is otherwise valid, judicial enforcement is barred by the running of the statute of limitations. We will consider each of these arguments.

### A. The Trust Issues

1. *Is the Plan Bound By Its Commitment to Pay Hoffa $1.75 Million, Irrespective of Errors Allegedly Made in the Calculation of His Entitlement?*

By almost any measure, this is an unusual case, and its unique facts make application of the settled doctrines of the law of trusts a difficult matter. Still, through reliance on two well-established doctrines of trust law, we are convinced that the Plan is bound by the commitments contained in the Agreement regarding the extent of Hoffa's entitlement. To begin with, we believe that the "finality clause" found in the Plan serves to bind the trustee and administra-

tors as well as Hoffa to good faith determinations regarding pension entitlements. Secondly, we believe that this case fits within the narrow range of situations in which trustees and beneficiaries are permitted to specify contractually the respective duties and rights arising under the trust. Before turning in detail to our analysis of these points, however, it is useful to sketch briefly the background of trust law against which the two doctrines on which this case turns operate.

■ Appellants make several indisputable observations regarding principles of the law of trusts that they contend control the disposition of the current litigation.[26] The preeminent truism to which appellants draw our attention concerns the obligation of the trustee to adhere rigidly to the terms of the trust. "It is the duty of the trustee to pay ... the beneficiary according to the terms of the trust ...." *Butler v. Builders Trust Co.*, 203 Minn. 555, 282 N.W. 462, 466 (1938). The amount of payments to be given a particular beneficiary is governed by, and must be determined by the trustee in accordance with, the trust instrument. Restatement (Second) of Trusts § 182 (1959) (duty to pay income); G. Bogert, Trusts and Trustees § 811 at 206 (rev. 2d ed. 1981). It is thus true that a beneficiary and a trustee lack the capacity to alter the terms of the trust instrument to the potential detriment of other beneficiaries. *Hitchcock v. Skelly Oil Co.*, 197 Kan. 1, 414 P.2d 67 (1966); *Beach v. Beers*, 80 Conn. 459, 68 A. 990 (1908); *see generally* G. Bogert, Trusts and Trustees § 992 at 425 (2d ed. 1962 & Supp. 1981). It is also true that a trustee is limited to the exercise of those powers conferred upon him by the trust instrument, *Cleveland Clinic Foundation v. Humphrys*, 97 F.2d 849, 856 (6th Cir.), *cert. denied*, 305 U.S. 628–29, 59 S.Ct. 93, 83 L.Ed. 403 (1938); II Scott on Trusts § 164 at 1254–57 (3d ed. 1967), and that contracts *ultra vires*

---

26. *See generally* Brief for Appellants at 16–20. The Plan contains no provision setting forth the law governing the construction of its terms, and neither party to the current litigation has suggested that the law of a particular state is to apply. As both appellants and appellee have made extensive reference to cases from several jurisdictions, we will resolve the trust issues present in this case by reference to the common law principles of the law of trusts.

entered into by the trustee may therefore be unenforceable. *Spencer v. Harris*, 70 Wyo. 505, 252 P.2d 115 (1953); *Towle v. Ambs*, 123 Ill. 410, 14 N.E. 689 (1888).

■ The sum of these doctrines is that a trustee cannot ordinarily promise to pay a beneficiary more than the trust instrument authorizes. What might be called their composite corollary is that when a trustee overpays a beneficiary the trustee is entitled to recover the excess payment, even when it was the product of unilateral mistake on the part of the trustee. III Scott on Trusts § 254 at 2183–84 (3d ed. 1967), and cases cited therein; Restatement (Second) of Trusts § 254, Comment (e) (1959); *see Lanston v. American Security & Trust Co.*, 32 A.2d 482 (D.C.1943); *Union Trust Co. v. Gilpin*, 235 Pa. 524, 84 A. 448 (1912).[27]

The difficulty with the application of these doctrines of trust law lies not in any dispute regarding their validity but rather in the unusual factual setting of this case. We do not, in the first place, have before us a situation in which the parties have attempted to *modify* the terms of the Plan. No matter how the arguments are parsed, no attempt at modification of the Plan was envisaged under the Agreement, nor, assuming that document's validity, was any modification accomplished. At most there occurred an incorrect computation of Hoffa's entitlement, from the effects of which error the administrators seek to escape through reliance on the trust doctrine proscribing modification and the contract doctrine of mistake.

The obstacle faced by the trustee and administrators in proffering these arguments is, of course, the Agreement. When stripped of all embellishment, the core of appellants' position is simply that *no* agreement regarding the amount of a beneficiary's entitlement under a trust can ever be effective if its terms are at variance with the corresponding terms in the trust instrument. Whether one calls the attempt at such variation a modification or a mere mistake, appellants' position is straightforward: the trust always governs. Thus, appellants request that we throw the Agreement's "warranties" out the window as not worth the paper on which they were written.

■ We are convinced, however, that these warranties are enforceable in light of two distinct, yet interrelated, doctrines of the law of trusts. It is well settled that provisions in the trust instrument that render the trustee's determination of a beneficiary's entitlement conclusive are enforceable, subject to certain limits grounded principally in the *terra firma* of good faith. As the draftsmen of the Second Restatement noted: "There is no public policy which prevents the avoidance of litigation by committing the determination with finality to the trustee." Restatement (Second) of Trusts § 187, Comment (k) (1959); *see generally* III Scott on Trusts § 187 at 1502–07 (3d ed. 1967). Although it is true that such finality clauses are usually employed to preclude judicial challenge of the exercise of discretionary powers, we consider the doctrine equally applicable where good faith errors have arguably been made in the construction of the trust instrument itself.

---

**27.** We note, however, that such recovery may not be permitted where the beneficiary has changed his position in detrimental reliance on the correctness of the overpayment; in such cases the beneficiary is entitled to retain part or all of the overpayment to the extent necessary to avoid injustice. *See* III Scott on Trusts § 254 at 2186–88 (3d ed. 1967). It thus appears that, in compelling overpaid beneficiaries to restore to the trust *res* the excess amount, courts are primarily concerned with possible inequity to other beneficiaries.

The settlement arrangement entered into by appellants with the Internal Revenue Service provided that, in the event that the Plan was unable to recover the amount of the alleged overpayment from Hoffa, appellants were required to repay the "excess" to the Plan from Teamster funds. *See* Closing Agreement and Indemnification Agreement; J.A. at 258–68; *Hoffa v. Fitzsimmons*, 499 F.Supp. at 364. As appellee Hoffa notes, Brief for Appellee at 42–44, appellants have already made whole the Plan in accordance with the strictures of the indemnification agreement. Thus, it is clear that no beneficiary of the Plan will suffer by virtue of the alleged overpayment to Hoffa regardless of the outcome of this litigation.

Almost needless to say, a finality clause does not confer on a trustee *carte blanche* to make any payment that he chooses, be he prompted by whim, caprice, altruism, or malice. Rather, even when the trust instrument purports to make the trustee's determination "final," it is clear that a court *will* interfere with that determination where the trustee acts in bad faith or from improper motives, or where his decision is outside the bounds of reasonable judgment as to the proper construction of the trust. *Cf.* III Scott on Trusts § 187 at 1501 (3d ed. 1967) (judicial control of trustee's use of discretionary powers). Still, it is manifest from even a cursory perusal of the treatises and relevant cases that a properly drafted finality clause or comparable provision vesting exclusive power with regard to entitlement or eligibility determinations in the trustee does serve to limit judicial review of rulings made under that clause or power.

Two cases will serve to illustrate the conclusive nature of finality clauses. In *Edmonds v. White*, 35 Del.Ch. 267, 118 A.2d 608 (1955), for example, Chancellor Seitz had occasion to consider the impact in a pension trust of a provision stating that the trust executors' decisions regarding eligibility, retirement dates, and computations of benefits were "final and conclusive." *Id.*, 118 A.2d at 610. Although the Chancellor noted that the power granted by the finality provision was limited by a general test of good faith, he ruled that the "broad" authority granted by the provision in question permitted the executors to make a "conclusive" determination of the pensioners' entitlements under the trust. *Id.*, 118 A.2d at 610. Similarly, in *Howe v. Sands*, 141 Fla. 813, 194 So. 798 (1940), the court sustained a grant to the executor of the exclusive power to determine eligibility under a will providing a bequest to each "servant" of the testator in such status at the testator's death. The court observed that such a conclusive power would be sustained and held binding on all concerned "in the absence of bad faith, or fraud, or a showing of arbitrary action ...." *Id.*, 194 So. at 801.

From these cases and others of similar ilk, we conclude that a finality clause can render a good faith determination of a trust beneficiary's entitlement binding on both beneficiaries and trustees. The question we must now turn to in the case at bar is the effect of the Plan language regarding the powers of the trustee and administrators. The Administrative Committee is given, under Article IV, ¶ 6 of the Plan, broad powers to carry out its duties. That section provides:

6. The Committee shall have such power as may be necessary to discharge its duties hereunder, including, but not by way of limitation, the power to interpret and construe this Plan, to determine all questions of eligibility and of the status of all rights of members and others hereunder, and to decide any dispute arising hereunder, which shall include, but not by way of limitation, the power to decide any question of fact respecting eligibility, duration of service, dates of birth, membership or retirement, salaries, computation of benefits and similar or related matters for the purpose of the Plan, *and its decision upon matters within its powers shall be conclusive.*

J.A. at 113 (emphasis added). Other paragraphs of Article IV provide that the Committee is empowered to designate an actuary to assist in, *inter alia,* the computation of entitlements and that any actions taken by the Committee in reliance on the actuary's calculations *"shall be conclusive upon each [trustee, the Union and its officers] and upon all members of the Plan."* Plan Article IV, ¶¶ 8, 11; J.A. at 113–14 (emphasis added).

Based on these broad authorizations, we have no doubt that the trustee and Committee were empowered to make final and conclusive determinations with regard to individual entitlements of beneficiaries. Although there is, at first blush, some ambiguity in the relevant language of Paragraph 6, we feel that the obvious intent of the draftsmen was that the decisions of the Committee are to be conclusive both on the Plan and on individual beneficiaries. The basic foundation of equity that pervades

the application of all trust doctrines would demand this interpretation.

Thus, the power of the trustee and Administrative Committee to make a conclusive determination of Hoffa's entitlement under the Plan would appear clearly established. The only remaining question is whether the commitment to pay the sum contained in the Agreement falls outside the limits on finality clauses imposed under the settled doctrine. As a matter of law, we hold that the commitment in question fell well within those boundaries. The good faith of the parties is manifest, and there has been no evidence adduced suggesting any fraud or overreaching. Rather, by all outward indications the parties to the Agreement simply intended to reduce their respective rights and obligations to writing. To be sure, there may have been—and we stress the conjectural nature of the statement—an error in entitlement calculation, but given the consonance of that "error" with the interpretation of the Plan consistently adopted prior to 1971, it is apparent as a matter of law that the decision of the trustee and Administrative Committee to award Hoffa $1.75 million was within the bounds of reasonable judgment with regard to the proper construction of the Plan.

As a distinct ground for upholding the warranties contained in the Agreement, we also hold that this case falls within the narrow range of situations in which parties to a trust may define contractually their rights and duties. It is beyond peradventure that in a variety of contexts separate agreements between beneficiaries and trustees regarding the amount of the particular entitlement have been upheld. In *Industrial Trust Co. v. Harrison*, 67 R.I. 131, 21 A.2d 254 (1941), for example, the Supreme Court of Rhode Island upheld a "compromise agreement" between trustees and a beneficiary that defined *contractually* the beneficiary's entitlement under a trust. In that case specific provisions of the trust instrument mandated payments of fixed sums, but also provided that those sums should be lower if certain life insurance policies were kept in effect. When one of the policies lapsed and the other was diminished in value, the beneficiary demanded payment of the larger sums. In defense the trustees presented an agreement that they had entered into with the beneficiary that, in essence, split the difference in the controversy. In the agreement the beneficiary waived any right she had to larger sums under the trust, and the compromise was carried out fully by the trustees. Without determining the actual amount the beneficiary should have received under the trust instrument, the court held that the agreement bound both the trustees and the beneficiary and ordered its enforcement.

■ From the *Industrial Trust Co.* case and similar ones, it seems clear that trust beneficiaries can, like other litigants, "make an effective and binding compromise agreement respecting their rights." *McGee v. Marbury*, 83 A.2d 157, 158 (D.C.1951) (will legatees). Such agreements, it is also clear, have an independent validity and vitality distinct from that of the payment term contained in the trust instrument. When such an agreement is authorized by the trust instrument, it will be enforced even if arguably inconsistent with the trust term if "fair and apparently in furtherance of the [settlor's] intent . . . ." *Industrial Trust Co.*, 21 A.2d at 261.

■ By analogy to compromise agreements, we accept, subject to certain conditions, that trustees and beneficiaries have the capacity to enter into binding agreements respecting the amount of a particular beneficiary's entitlement, and that such agreements are binding even if the amounts in question are subsequently alleged to be inconsistent with the payment provisions in the trust instrument. As was the case with finality clauses, however, the power to define contractually rights and duties arising under a trust is not a limitless one; rather, the same general types of controls obtain. Thus, where parties to a trust intend to reduce to a separate writing their respective rights and obligations, that writing will be honored if not otherwise forbidden under the trust provisions and if entered into in good faith without a showing

of fraud or arbitrary action. Further, as was the case with finality clauses, the separate agreement must fall within the bounds of reasonable judgment as to the proper construction of the trust provisions; once again, the power to reduce trust obligations to a separate writing is not *carte blanche* to ignore the governing trust instrument.

Turning to the agreement at issue in this case, we harbor no doubt that these general authorizations empowered the trustee and administrators of the Plan to enter into the Agreement. *See* Plan Article IV, ¶ 6, *supra*. Although it is true that Article IV, ¶ 3 provides in part that the Administrative Committee is only permitted to "make rules and regulations not inconsistent with the terms and provisions of the Plan," we read this disabling provision as a paraphrase of the general doctrine of trusts holding that a trustee may act only in accordance with the terms of the trust. As we have suggested above, we view neither compromise agreements nor, in the specified contexts, agreements as to entitlements, as *ultra vires*.

As for the remaining requirements, there is no dispute regarding the good faith of the parties nor is there any suggestion that Hoffa contributed to the alleged error in benefit calculation or otherwise acted improperly. The Agreement was by all accounts reflective of the joint understandings then entertained by Hoffa and the Plan administrators of the proper construction of the Plan. Under such circumstances we are not inclined to disturb the Agreement on grounds of capacity or other doctrines of trust law.

Given our acceptance both of the validity of agreements between a beneficiary and a trustee determining the beneficiary's trust entitlement, and of the conclusive efficacy of finality clauses, the critical point is that such commitments made by trustees with regard to entitlements may be enforceable regardless of alleged inconsistency with the payment terms of the trust. Thus, in such cases no judicial inquiry is necessary to determine what the trust instrument actually mandates by way of payment. The

agreement now governs, not the trust. Accordingly, we hold that the Plan's trustee and administrators are bound, as a matter of trust law, to the entitlement commitments made Hoffa in the Agreement.

### 2. *Summary.*

Our rulings on the efficacy of the Agreement and of the Plan's finality clause are not intended to constitute groundbreaking in the law of trusts. Indeed, for most practical purposes these aspects of our holding are limited to the unusual facts of this case. In the overwhelming majority of cases involving trusts, trustees will pay and beneficiaries will be paid according to the trust instrument. Agreements between trustees and less than all beneficiaries are ineffective, at least absent court approval, to modify the terms of a trust; moreover, where the settlor has specified a certain mode, amount, or timing of payment in the trust instrument, that specification must govern even if both the beneficiary and the trustee wish to change it. Similarly, finality clauses will not insulate trustees from errors of judgment in the construction of unambiguous provisions, nor will trustees be permitted unilaterally to deprive beneficiaries of entitlements through conclusory reliance on such clauses.

In limited contexts, however, agreements between trustees and beneficiaries regarding even benefits have a utility that acceptance of appellants' position would eliminate. If it were the case that no agreement regarding entitlements could ever have independent validity, then, for example, no compromise arrangement between a trustee and beneficiary could be free from subsequent attack. In like manner, finality clauses serve the important function of frequently averting acrimonious litigation, even if that function was not served in this case.

### B. *The Contract Issues*

In light of the district judge's fine discussion of the contract issues involved in this

litigation, our consideration of those questions may be brief.[28]

### 1. Mutual Mistake of Material Fact.

■ Appellants allege that, whatever force as a matter of theory agreements regarding trust entitlements may possess, the arrangement entered into between Hoffa and the Plan must fail because both parties labored under a mistake of fact. The "mistake" that allegedly obtained was a mistake regarding the appropriate actuarial assumptions needed to effectuate the Plan's provisions.

Appellants' argument in this regard fails. As the district judge noted,[29] the Plan's administrators unconditionally warranted in the Agreement that Hoffa was entitled to the sum of $1,745,141.21 as a lump sum termination benefit.[30] The Plan's administrators accordingly bound themselves under the Agreement to release the restricted sums unless a determination was made that the lump payment violated the applicable Treasury regulations.[31] As the district judge properly ruled, these warranties bound appellants irrespective of any mistake regarding the Plan's construction. *Hoffa v. Fitzsimmons*, 499 F.Supp. at 362.

Thus, under the circumstances of this case, it is clear to us that the Plan bore the risk of any mistake regarding the correctness of the calculation of Hoffa's entitlement. The Plan delegated the computation of the entitlement to its actuary, and thus the mistake is properly attributable only to appellants. *Fidelity & Deposit Co. of Maryland v. McQuade*, 123 F.2d 337 (D.C.Cir. 1941). As the district judge aptly summarized the matter, appellants "bargained that they would bear the loss in the event it turned out that the[ ] facts were otherwise

than as represented." *Hoffa v. Fitzsimmons*, 499 F.Supp. at 362. "[I]f a material state of facts is warranted to exist which turns out not to be the case, the warrantor is liable for the loss or damage caused; and it is no defense that he acted upon misinformation and in good faith." *Pittsburgh Coke & Chemical Co. v. Bollo*, 421 F.Supp. 908 (E.D.N.Y.1976), aff'd, 560 F.2d 1089 (2d Cir. 1977). The Plan must bear the burden of the actuary's mistake, if indeed one was made.[32]

■ Appellants also argue that the parties did not intend to "vary" the trust and that, as the Agreement was such a de facto variation, it must fail. The simple answer to this contention is that the parties did not intend, nor did they succeed, in varying the trust; rather, they succeeded only in entering an agreement that set forth their respective payment benefits and obligations under the trust.

### 2. Breach of Fiduciary Duty.

■ Appellants also contend that, whatever the rights might be of a "normal" beneficiary in enforcing an agreement such as the one at issue in this case, Hoffa's unique relationship to the Teamsters prevents him from enforcing the Agreement. The thrust of this argument is that, given Hoffa's one-time fiduciary obligations to the Plan, any acceptance by him of benefits in excess of those to which he was entitled would constitute a violation of the common law fiduciary duties of union leaders and of duties imposed by section 501 of the Labor-Management Reporting and Disclosure Act, 29 U.S.C. § 501 (1976). Once again, however, we may dispose of this contention summarily.

---

**28.** Paragraph 30 of the Agreement provided that its terms were to be construed and interpreted according to the laws of the State of Michigan. The district judge apparently assumed the applicability of Michigan law to the contract issues involved here, and we shall as well.

**29.** *Hoffa v. Fitzsimmons*, 499 F.Supp. at 360.

**30.** Agreement for Deposit ¶ 1; J.A. at 26.

**31.** As noted earlier, no such determination was made by the administrators prior to their refusal to authorize release of the disputed amount. *See* note 20, *supra*.

**32.** Again, the district judge made no finding confirming the correctness of the construction of the Plan adopted by the Internal Revenue Service. *See Hoffa v. Fitzsimmons*, 499 F.Supp. at 364.

There is nothing in the record that supports in any way the implication that Hoffa conspired with the Plan's administrators to enlarge his benefit share, nor is there any suggestion of overreaching or any absence of good faith on his part. Indeed, in light of the significant limitations on Hoffa's activities imposed by the iron and granite of Lewisburg Penitentiary, it would seem likely that his rigid control over Teamsters activities had been considerably reduced by 1971. Hoffa, as the district judge found,[33] is an innocent party in the present context, and we will not allow mere allegations of the appearance of connivance on his part by the appellants to interfere with the enforcement of the Agreement. Summary rejection of this argument was appropriate.

### 3. *Absence of Consideration.*

 Appellants further argue that the Agreement is not enforceable against them because of an absence of consideration. Appellants argued in the district court and contend here that, as Hoffa was both already legally barred from immediate withdrawal of the restricted sums, and as the Agreement did not modify the Plan's pre-existing duties, there could have been no benefit to the Plan nor any detriment to Hoffa flowing from the operation of the Agreement. Appellants argue, accordingly, that the doctrine holding that a pre-existing duty is no consideration compels a ruling that the Agreement is ineffective to bind them. Even assuming the validity of the pre-existing duty doctrine[34] in cases in which the parties otherwise intend to be bound and there is no coercion or overreaching,[35] however, we find that consideration existed to support the Agreement. Appellants argue on this score that, as the parties' rights were definitively established under the Plan, there was no conceivable benefit to them or detriment to Hoffa by virtue of the Agreement. It is true that, under Michigan law, legal consideration necessitates a "right, interest, profit, or benefit accruing to one party, or some forebearance, detriment, loss or responsibility given, suffered, or undertaken by the other." *Sambo's Restaurants, Inc. v. City of Ann Arbor*, 473 F.Supp. 41, 45 (E.D.Mich.1979), *rev'd on other grounds*, 663 F.2d 686 (6th Cir. 1981). Appellants accordingly argue that the Agreement merely restated existing duties and was arrived at only for Hoffa's personal income tax convenience.[36] In support of this position they suggest a dearth of "negotiation" or "bargaining" prior to the initialing of the Agreement.[37]

 As the district judge noted, however, a number of legal and practical benefits flowed to the benefit of the Plan and to the detriment of Hoffa as a result of the Agreement. The trial judge stated, correctly, that appellants were benefitted by the Agreement in that (1) their fiduciary obligations to Hoffa were partially discharged by it; (2) the escrow provisions protected the Plan from potential liabilities to the government and to other beneficiaries; and (3) appellants' duties under the

---

**33.** *Id.* at 363 & n.23.

**34.** The notion that a pre-existing obligation can *never* constitute consideration has been subjected to strong attack. *See* 1A Corbin on Contracts § 171 at 105 (1967); C. Fried, Contract as Promise 34–35 (1981). The traditional rationale employed in support of the pre-existing duty doctrine is that it prevents overreaching and blackmail. *See* Williston, *Successive Promises of the Same Performance,* 8 Harv.L.Rev. 27 (1894). As Professor Fried notes, however, the modern trend is toward recognition of promises whose legitimacy the strict consideration doctrine placed in doubt, so long as the sincerity of the obligation is clear and the commitment freely made. C. Fried, *supra*, at 39. It appears to be the case, however, that the performance of an existing legal

obligation is not consideration under Michigan law. *Puett v. Walker*, 332 Mich. 117, 50 N.W.2d 740 (1952).

**35.** No evidence in support of such allegations has been adduced in this case.

**36.** Brief for Appellants at 30.

**37.** *Id.* at 28–29. It is true that, under the law of Michigan, the element of bargain is essential. "Valid consideration for a contract cannot be presumed merely because two parties receive benefit from each other. Rather, a bargained for exchange is required." *Higgins v. Monroe Evening News*, 404 Mich. 1, 6, 272 N.W.2d 537, 543 (1978).

Plan and under the Treasury regulations were fulfilled.[38] That these same benefits to the Plan also benefitted Hoffa does not, contrary to appellants' assertion, affect their status as consideration. Given the principle that courts will not inquire into the adequacy of consideration, it is clear that these benefits to appellants are enough to mandate enforcement of the Agreement. See Sambo's Restaurants, 473 F.Supp. at 45.

Moreover, the district judge's opinion suggests what to us is the coup de grace of appellants' consideration arguments. We noted in Part IIA that agreements between trustees and beneficiaries regarding trust entitlements usually must bind both signatories; that is, neither party can later complain that the amount specified in the agreement is incorrect, at least in the absence of other factors militating against enforcement. In this case, Hoffa, relying on the computation by the Plan's actuary of the amount owed him by the Plan, accepted the warranties and escrow provisions based on that computation. The district judge properly observed that appellants' pre-existing duty to pay Hoffa was "superseded" by the warranties made in the instrument.[39] In a like fashion, the district judge might have noted that Hoffa, too, was bound by that calculation. Thus, Hoffa, in entering into the Agreement, surrendered the right subsequently to demand payment under the Plan according to his own computation of the benefits to which he was entitled. As the district judge noted, Hoffa's reliance on the computations made by the Plan's actuary and on the warranties contained in the Agreement "may appropriately be regarded as a significant legal and practical detriment to him."[40]

We thus have no doubt of the presence of consideration to support the Agreement.

### 4. The Statute of Limitations.

Finally, appellants argue that Hoffa's attempt to enforce the Agreement is barred by the applicable statute of limitations. They contend that the entitlement warranty contained in the Agreement was one of a present fact, and, as such, was breached as of the time of contracting. Since the applicable limit period is three years, they argue, Hoffa's action, which commenced in 1976, is time-barred. This is the case, appellants contend, even if the breach of the present fact warranty could not reasonably have been discovered by Hoffa until the limit period had run.

■■■■ The trial court properly rejected this contention. District of Columbia Code section 12–301 provides, in pertinent part, that the limitation period applicable to a simple contract action is three years "from the time the right to maintain the action accrues . . . ."[41] D.C.Code Ann. § 12–301 (1981). A claim for breach of warranty is governed by this provision. We agree with the district judge that the breach in question in this case occurred in 1976 on the date on which Hoffa was entitled to release of the amount in the escrow account. Although we accept the distinction drawn by appellants between warranties of present facts and warranties of future performance, see Zellan v. Cole, 183 F.2d 139 (D.C.Cir. 1950), it is clear to us that, in addition to warranting the correctness of the lump sum

---

**38.** Hoffa v. Fitzsimmons, 499 F.Supp. at 366.

**39.** Id.

**40.** Id. at 366 n.38.

**41.** . Sitting in a diversity case, a federal court is bound to apply the statute of limitations that a court of the forum "state" would apply. Guaranty Trust Co. v. York, 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945). The determination of which statute governs—here, that of Michigan or that of the District of Columbia—depends on the forum's choice-of-law rules. Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S.

487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). The District of Columbia Court of Appeals has explicitly stated that the question of whether an action is time-barred is one that is procedural in nature and accordingly is governed by the statute of limitations of the forum. Hodge v. Southern Ry., 415 A.2d 543 (D.C.1980); May Dep't Stores Co. v. Devercelli, 314 A.2d 767 (D.C.1973). As the District of Columbia would have applied its own limitation period in this case, we must adhere to the same rule. Steorts v. American Airlines, Inc., 647 F.2d 194, 197 (D.C.Cir.1981).

amount, appellants also in the Agreement promised to release the second escrow sum on January 1, 1976. It is apparent that this is a breach of warranty that occurred, as the district judge ruled, on that 1976 date. Accordingly, the action was timely filed on April 8, 1976.

### III. SUMMARY JUDGMENT AND THE QUESTION OF RELIEF

■ After reviewing extensively the relevant documents in this case and the accompanying record, we agree with the district judge that appellee Hoffa was entitled to summary judgment on the general question of the enforceability of the Agreement. As a matter of law the Agreement is valid. As suggested at the outset, however, we have some problem with the relief granted Hoffa and with the method by which the appropriateness of that relief was determined.

By way of brief recapitulation, Hoffa's complaint, as finally amended, contained two counts based on the Agreement. Count I set forth the recitals in the Agreement and prayed for specific performance of the warranty to release the second escrow amount; Count III alleged that the warranties were false and requested damages in the amount of the shortfall. Although the district judge noted that the two counts were "closely related" [42] in substance, it remains the case that plaintiff sought and was granted summary judgment only on Count III, the damages count.

The problem we have with this resolution of the litigation is that the rhetoric and findings of the district court do not support the conclusions necessary for summary judgment on Count III. The sum and substance of that count was that the appellants breached the warranty specifying the amount of the lump sum benefit by overstating that amount. Hoffa alleged in Count III that appellants warranted that

the lump sum was a certain amount *when in fact it was a lesser amount*; this dissonance, he contended, injured him to the extent of the difference. It is clear, therefore, that to prevail on Count III it must be established that such a divergence between the "true cash termination benefit" [43] and the warranty existed. Yet the district judge conspicuously avoided any findings on the subject of Hoffa's actual entitlement under the Plan. Rather, the district judge's findings make clear that he was intending (1) to uphold the validity of the Agreement, and (2) to order the parties to comply with its terms. It is thus apparent that, in fact, the district judge intended to order specific performance of the terms of the Agreement; the rub here, of course, is that specific performance was the remedy sought under the *first* count of Hoffa's complaint.

The district judge recognized this problem and elicited a stipulation from the parties to the effect that a court order to turn over the funds held in escrow would be an appropriate remedy without a finding of the need for specific performance.[44] In light of this stipulation, and in light of the substantive identity of the component allegations contained in Counts I and III of Hoffa's complaint, we remand the cause and order, *sua sponte*, the district court to enter summary judgment on the "closely related" first count in favor of appellee Hoffa.

■ We are well aware in taking this course that appellate courts should rarely on their own motion affirm summary disposition of a case on a ground or theory other than the one relied on in the trial court. *See Fountain v. Filson*, 336 U.S. 681, 69 S.Ct. 754, 93 L.Ed. 971 (1949); 10 C. Wright & A. Miller, Federal Practice & Procedure § 2716 at 441–42 (1973). Yet there is ample precedent in support of the prerogative, if not the duty, of an appellate court to affirm a summary judgment on a ground other than that employed in the district

---

**42.** *Hoffa v. Fitzsimmons*, 499 F.Supp. at 361.

**43.** Amended Complaint at 3, ¶ 22, *Hoffa v. Fitzsimmons*, 499 F.Supp. 357 (D.D.C.1980); J.A. at 65.

**44.** *Hoffa v. Fitzsimmons*, 499 F.Supp. at 360 n.8.

court where there exists no material controversy regarding matters of fact or law. *See Kuehn v. Garcia*, 608 F.2d 1143, 1146 (8th Cir. 1979) ("trial court's judgment may be sustained regardless of an incorrect analysis if the same result may be reached·on theories other than those employed by the trial court"); *Turner v. Local Union No. 302*, 604 F.2d 1219, 1224 (9th Cir. 1979) ("it is proper to affirm a summary judgment on any ground that appears from the record, whether or not the trial court relied on it"); *Calnetics Corp. v. Volkswagen of America, Inc.*, 532 F.2d 674, 682 (9th Cir.), *cert. denied*, 429 U.S. 940, 97 S.Ct. 355, 50 L.Ed.2d 309 (1976). It is clear to us that the requirements of Fed.R.Civ.P. 56(c) are met in this case and that appellee is entitled to judgment as a matter of law.

■ It is quite true that our order mandates the entry of summary judgment on a ground other than that on which the movant relied. Given the special context of this case, however, we feel that no point would be served by a remand to the district court for a full hearing; the result of such a course would be, it is clear, the entry of summary judgment on Count I. As a matter of the applicable substantive law, the district judge's summary ruling on Count III necessarily involved a determination that the Agreement was valid and enforceable, and appellants themselves stipulated that an order compelling release of the escrowed funds was an appropriate remedy without detailed findings on the propriety of specific performance.[45] Thus, as a matter of law, all requisites for the award of summary judgment to Hoffa on the third count are present. It is also clear that an appellate court has the power, in appropriate cases, to grant summary judgment even when it was not requested. *International Longshoremen's Association v. Seatrain*

*Lines, Inc.*, 326 F.2d 916, 921 n.2 (2d Cir. 1964); *First National Bank in Yonkers v. Maryland Casualty Co.*, 290 F.2d 246, 251 (2d Cir.), *cert. denied*, 368 U.S. 939, 82 S.Ct. 381, 7 L.Ed.2d 338 (1961); *see also Paskaly v. Seale*, 506 F.2d 1209, 1211 n.4 (9th Cir. 1974) ("While the district court did not grant the summary judgment on this ground, we are free to affirm on any ground supported by the record, provided the parties have had the opportunity to discuss it in their briefs").[46]

As the Agreement is valid, and as the district judge's findings, combined with the stipulation, mandate summary judgment, we remand the case and order the entry of such judgment on Count I.

■ The determination of the proper legal theory on which summarily to dispose of this litigation does not, unfortunately, end our difficulties. We have some concern about the district judge's implementation of his summary judgment order, even given the stipulation. Again, however, only slight modification of the district court's order is required. By way of relief in this case, the American Security and Trust Company was ordered to release to Hoffa the second escrow amount. The difficulty with this response is that the district court, at the time of the order's entry, had no jurisdiction over the bank and hence was not empowered to order it to do *anything*. The American Security and Trust Company, though initially a party to this litigation, was dismissed as a party in appellee's amended complaint, and the district court accepted this dismissal in an order dated May 8, 1978.[47] This absence of personal jurisdiction over the bank absolutely bars the district court from entering any order compelling the bank to do anything. Thus, we must, again *sua sponte*, vacate that part of

45. Such stipulations, which obviate the need for the specific findings normally required before a court of equity will compel specific performance, will be honored by courts. *See, e.g., Hohenberg Bros. Co. v. Killebrew*, 505 F.2d 643, 645 (5th Cir. 1974).

46. If an appellate court is empowered to grant summary judgment to a party who failed to

request it on any ground, we assume that the "lesser included power" to grant such judgment on a ground other than that requested exists.

47. *Hoffa v. Fitzsimmons*, 499 F.Supp. at 360 n.8.

the district court's decision that orders the bank to release the funds to Hoffa.

Hoffa will not want for a remedy, however. It is quite clear from the circumstances surrounding the disposition of the litigation that what the district judge intended was to order *appellants* to deliver to the bank the certificate contemplated under the Agreement authorizing the bank to release the escrowed amount. This was the chief form of relief requested by Hoffa in connection with Count I and is clearly the most appropriate redress he can be granted. Hoffa's claim centers on the contention that he is entitled to the second escrowed sum by the terms of the Agreement; appellants' defense is, in essence, that he is not so entitled. On these facts it is manifest that the most appropriate relief from the standpoint of all concerned individuals—including the American Security and Trust Company—is that appellants be ordered to authorize the bank to release the disputed funds to Hoffa. We accordingly will remand the case to the district court for an appropriate modification of the order of relief.

## IV. HOFFA'S COUNT IV AND APPELLANTS' COUNTERCLAIM

Appellee Hoffa in his Count IV claimed that his lump sum cash termination benefit was incorrectly calculated to his detriment. In light of our ruling above that Hoffa, as well as appellants, is bound to the warranted amounts contained in the Agreement, it is clear that this count was properly dismissed by the district court. Appellants' counterclaim was likewise properly dismissed as precluded by the validity of the Agreement.

## V. CONCLUSION

Appellants have prosecuted this case under the compulsion of the Internal Revenue Service. They have carried out their responsibilities to the IRS and were ably represented by counsel in the process. Today, fully six years after the disputed amount was scheduled to be released, their position has been rejected. We urge swift compliance with the terms of this decision.

*Affirmed in part, vacated in part, and case remanded to the district court for proceedings not inconsistent with this opinion.*