Carolyn ROSILE, Plaintiff,

v.

AETNA LIFE INSURANCE CO., a Connecticut corporation; the Boeing Company, a Delaware corporation; the Boeing Employee Welfare Benefit Plan, otherwise known as Group Life Policy 707, a legal entity; and the Welfare Benefit Plans Committee, the plan administrator for Group Life Policy 707, Defendants.

No. 89–1560–C.

United States District Court,
D. Kansas.

Oct. 2, 1991.

Terry J. Torline, William Robert Martin, Martin, Pringle, Oliver, Wallace & Swartz, Wichita, Kan., for plaintiff.

Charles P. Efflandt, John J. Murphy, Susan L. Smith, Foulston & Siefkin, Wichita, Kan., for defendants.

## MEMORANDUM AND ORDER

CROW, District Judge.

On February 27, 1987, Frank Rosile, a Boeing employee, died. This case arises out of Carolyn Rosile, Frank Rosile's wife's, action to recover life insurance benefits under a group plan life insurance policy issued by Aetna Life Insurance Company (Aetna) to The Boeing Company (Boeing). Rosile's claim for benefits arises out of the Employee Retirement Income Security Act of 1974 (ERISA). Rosile also claims that certain defendants have breached fiduciary duties imposed by ERISA. Rosile further contends that one or more of the defendants is liable for statutory penalties under ERISA for failure to timely provide plan information. Rosile also seeks attorneys fees. The defendants deny each of Rosile's claims.

This case comes before the court upon the defendants' motion for summary judgment and upon the plaintiff's motion for partial summary judgment. The court, having considered the briefs of the parties, facts and applicable law is now prepared to rule. The court, where possible, has condensed and considered the parties' arguments from the defendants' motion for summary judgment and the plaintiff's motion for partial summary judgment at the same time.

The court has thoroughly reviewed the "uncontroverted facts," the deposition testimony, affidavits or exhibits supporting those facts, and the plaintiff's responses. While some of the defendants' uncontroverted facts are truly uncontroverted, on several occasions the plaintiff inserted the phrase "controverted in part" and included an explanation. Often this phrase was unsupported by any evidence to the contrary. The plaintiff has also controverted several statements which the defendants had taken almost directly from Carolyn Rosile's deposition. The court understands the temptation to minimize the damage of admissions by the plaintiff, but controverting the defendants' uncontroverted facts which are supported by virtually verbatim quotes of the plaintiff only serves to hamper the court's disposition of the motion.

In regard to the affidavits of Laura Topazio, the court has carefully reviewed her affidavit, her supplemental affidavit and the discovery materials referenced by the parties in deciding these motions.

### Facts

The parties agree that jurisdiction and venue are properly laid in this district. The parties also stipulate that Carolyn Rosile is a resident of Wichita, Kansas. Aetna is a corporation organized and existing under the laws of the State of Connecticut. Aetna is licensed and doing business in the

State of Kansas as an insurance company. Boeing is a corporation organized and existing under the laws of the State of Delaware. Boeing is authorized to transact business in Kansas. The parties also stipulate that the law governing this case is ERISA.

In 1953, Frank J. Rosile began his employment as an engineer with Boeing. Carolyn Rosile was his wife.

Effective March 1, 1972, Aetna issued to Boeing an insurance policy, identified as Group Policy No. GL707 (the "Group Plan"). This policy provided disability and life insurance coverage to Boeing employees. The Group plan consists of six major parts or "Articles." Article I contains the general insuring provisions, including definitions, identification of the employers whose employees are covered, and general provisions regarding employee eligibility. Article II describes the nature of the benefits that are provided. Article III explains the circumstances under which the insurance coverage will be terminated as to any individual employee. Article IV concerns the amount of the premiums payable and the method of payment. Article V describes the way in which the insurer and the participating employers may discontinue the policy. Article VI consists of "Miscellaneous Provision," including provisions relating to the right of individuals leaving Boeing's employment to convert their group life insurance coverage to individual life policies under specified circumstances.

The Group Plan provides both life insurance benefits and disability benefits in the event of a "total and permanent disability." The Group Plan provides that, in most circumstances, the life insurance benefit will be equal to 225% of the employee's "annual rate of basic earnings," subject to exceptions not applicable here. At the time he retired from Boeing, Frank J. Rosile was earning $53,000 per year, which would calculate to a death benefit of $119,250 ($53,000 × 225%).

Under the terms of the Group Plan, all employees of a participant employer are eligible for coverage. This general provision is, however, subject to an express exception: "An employee shall not be an eligible employee in any calendar month if he is not on the active payroll of a Participant Employer on the first day of the month." An employee may however, under certain circumstances, still be covered under the Group Plan.[1]

Under the defendants' original interpretation of the Group Plan (and the manner in which they interpreted the plan in their motion for summary judgment), the defendants suggest that the only means by which an individual who is no longer employed by a participant employer may be covered under the Group Plan is if there is a determination that the individual is "totally and permanently disabled." Article I, Section 5, II, B, 2; p. 5–F, defines the phrase "totally and permanently disabled:"

The term "totally and permanently disabled" means the following tests must be met:

(a)(i) With respect to an employee who is covered under LTD–707 (which is another contract between the Policyholder and the Insurance Company), such employee ceases active work because an illness or injury is preventing such employee from performing the duties of his own occupation, or other appropriate work made available by his Participant Employer, during the first twenty-four months of such total and permanent disability and thereafter prevents the employee from working in any reasonable occupation (for the purposes of this section, "reasonable occupation" means as to any employee, any occupation or employment for which the employee is fitted by education, training or experience), or

(ii) With respect to an employee who is not covered under LTD–707 (which is another contract between the Policyholder and the Insurance Company), such employee ceases active work be-

1. The court will briefly discuss each parties' interpretation of the Group Plan in regard to eligibility for continued coverage. The distinc- tions between each party's interpretations, however, are irrelevant to the ultimate issues of this case.

cause an illness or injury is preventing such employee, for life, from engaging in employment or occupation for compensation or profit; and

(b) The employee has continuously met the requirements in (a) above for a period of at least six months.

The Group Plan provides that an individual who does not meet the eligibility requirements upon cessation of work may be reinstated under the Group Plan under certain conditions:

If a Participant Employer terminates an employee's insurance due to cessation of active work, and the Insurance Company subsequently determines that such individual would otherwise have met the definition of being totally and permanently disabled, then, notwithstanding any contrary provision in Article VI, Section 7, Conversion Privilege, provided any individual policy or policies issued to such individual pursuant to Article VI, Section 7 of this policy as a result of such termination are surrendered without any claim other than for return of any premium paid therefor, such individual shall again be deemed to be an employee in accordance with rules specified above for continuation due to being totally and permanently disabled.

(Article I, Section 5, II, B, p. 5–G.)

The Group Plan also contains a provision which allows individuals who cease to be employed by a participant employer (and thus would potentially lose coverage under the Group Plan) to obtain an equal amount of life insurance coverage if they choose to convert to an individual policy. Issuance of an individual conversion policy is conditioned, however, on the surrender of life insurance under the Group Plan:

When any insurance becomes effective under an individual policy issued under the conversion privilege, it shall be in exchange for all privileges and benefits under the group policy.

(Article VI, Section 7, p. 14. (Rev.))

As indicated above, an individual who is no longer employed by a participant employer may, under certain circumstances, be reinstated under the Group Plan. Reinstatement under the Group Plan is conditioned upon an individual's surrender of "any individual policy ... issued to such individual pursuant to Article VI, Section 7 ... without any claim other than for return of any premium paid therefor ..." (Article I, Section 5, II, B, p. 5–G.)

In contrast to the defendants' interpretation of these provisions of the Group Plan, the plaintiff suggests that an individual who is granted an approved leave of absence and is thereafter unable to return to work due to a total and permanent disability lasting an additional five months is entitled to continued coverage, at no charge, under the Group Plan. Therefore, under certain circumstances an individual may be covered under the Group Plan without incurring the cost of converting to an individual plan.[2]

In April 1986, Frank Rosile was diagnosed as having cancer of the lung and brain. Frank Rosile underwent surgery for that condition in May 1986. Frank Rosile continued to work at Boeing until he had surgery in May 1986.

By August 1986, Frank Rosile had decided that he wanted to take early retirement from Boeing. By taking early retirement, Frank Rosile became eligible to receive certain specified retirement benefits, including

---

**2.** The plaintiff suggests that Frank Rosile could have taken advantage of this provision without converting to an individual policy. The defendants reply:

In response to paragraphs 5–14 of Defendants' Statement of Uncontroverted Fact plaintiff suggests that, by virtue of the fact that Mr. Rosile was on medical leave, he might have had continued coverage under the Group Plan for a six month period beginning in mid-May, 1986 (Doc. 50, at 2–6). Even if this were correct, group life insurance coverage there-

under still would have terminated in mid-November, 1986 unless Mr. Rosile had made a request for a determination of permanent and total disability, which he did not do. In any event, regardless of whether there *could* have been continued coverage under the Group Plan for some period after Mr. Rosile's retirement, it is absolutely clear from the provisions of the Group Plan itself that individual life insurance and group life insurance were mutually exclusive.

pension benefits of approximately $1,420 per month. By August 1986, Frank Rosile's medical condition was very poor. Frank Rosile's life expectancy was very limited and was uninsurable except through Boeing.

On August 15, 1986, Mary Fager of Boeing came to St. Francis Hospital and met with Frank and Carolyn Rosile to discuss Frank Rosile's retirement options and for Fager to advise the Rosiles concerning their life insurance benefits under the Group Policy. While the parties agree that this meeting occurred, the parties disagree as to the substance of Fager's statements.[3]

The defendants contend that Fager advised the Rosiles that Frank Rosile had not yet met the time requirements (six months) for total and permanent disability, as defined by the Group Plan, and that, because of this, Frank Rosile's life insurance coverage under the Group Plan would terminate upon his retirement. The defendants assert that Fager advised the Rosiles that if they wanted to be certain that Frank Rosile had life insurance coverage between the time of his retirement and the time that a determination could be made that he was totally and permanently disabled as defined by the Group Plan (and therefore qualified for reinstatement of life insurance coverage under the Group Plan), they would have to obtain an individual conversion life insurance policy in accordance with Article VI, Section 7 of the Group Plan. Fager claims that she advised the Rosiles that if and when Frank Rosile qualified for reinstatement under the Group Plan, he could surrender the conversion policy, come back under the Group Plan and the premiums he paid would be refunded.

Carolyn Rosile disputes that Fager gave such advice. Carolyn contends that the only advice Fager gave on that day was that the Rosiles' life insurance coverage under the Group Policy would forever terminate when Frank Rosile retired from his employment from Boeing.

Carolyn Rosile has testified that if, contrary to Fager's representations, life insurance coverage under the Group Plan would have continued after Frank Rosile's retirement, the Rosiles would not have applied for an individual policy. Carolyn Rosile apparently understood that an individual policy would not have been available to the Rosiles had life insurance coverage under the Group Plan continued after Frank Rosile's retirement.

Frank Rosile elected to convert to an individual policy and on August 20, 1986, he signed an application for such a policy. This application, which Carolyn Rosile read and actually completed except for signature, specifically provided that it was submitted "in accordance with the provisions of Group Policy No. GL707." The application stated that Frank Rosile's employment with Boeing terminated September 1, 1986, by virtue of his retirement. At the bottom of the application, the following appears:

> IT IS MUTUALLY AGREED THAT: (1) The statements and answers made herein are complete and true to the best of my knowledge and belief; (2) issuance of the policy applied for shall be exchanged for all privileges and insurance on my life under the Group Policy; (3) no person other than Aetna can make, modify or discharge a contract or waive any of Aetna's rights or requirements.[4]

Carolyn Rosile understood that in applying for the individual conversion policy that Frank and she were giving up the life insurance coverage under the Group Policy. The amount of insurance applied for in the August 20, 1986, application was $119,250—the same amount of coverage that was offered under the Group Policy.

On September 1, 1986, Frank Rosile retired from Boeing. The individual conversion policy that Frank Rosile applied for on August 20, 1986, was issued effective Sep-

---

**3.** The defendants contend that this factual dispute is immaterial to the disposition of their motion for summary judgment. The defendants contend that, even assuming the plaintiff's version of the facts is true, they are entitled to summary judgment as a matter of law based upon the terms of the Group Policy.

**4.** The plaintiff contends that this clause is immaterial to the disposition of this case.

tember 21, 1986. The individual conversion policy was issued by Aetna.

Following retirement, Frank Rosile did not make a request pursuant to Article I, Section 5, II, B of the Group Plan for a determination of "total and permanent disability," or for reinstatement under the Group Plan as a consequence of any such disability, even after the expiration of the six-month definitional waiting period, which expired on November 15, 1986.[5]

On February 27, 1987, Frank Rosile died. The Rosiles have paid all of the premiums due on the individual conversion policy prior to Frank Rosile's death, totalling $2,523.42.

On March 27, 1987, Carolyn Rosile signed a Claimant's Statement Upon Death pursuant to which she made demand on Aetna Life Insurance and Annuity Company for payment of the death benefit under the individual conversion policy number N3871104.[6] This was the only policy under which Carolyn Rosile made a claim at the time because it was the only one she thought provided coverage.

On March 9, 1987, Fager sent a letter to Carolyn Rosile and advised her that, because of Frank Rosile's extended illness, benefits might be payable under the Group Plan. Fager asked that Carolyn Rosile submit certain documents so that it could be determined whether Carolyn was entitled to any benefits under the Group Plan. It was the receipt of this letter that first suggested to her that she might be able to obtain two death benefits.

On April 6, 1987, Ken Barton, Boeing's Administrator—Group Insurance, on behalf of Carolyn Rosile, submitted a post-mortem application for disability and death benefits under the Group Plan to Aetna's Employee Benefits Division (EDB) based upon Frank Rosile's disability which had persisted for the requisite six months by November 16, 1986. At that time, Barton was not aware that Rosile had made a demand upon Aetna's Personal Financial Security Division (PFSD) for payment of the death benefit under the individual conversion policy.

Upon receipt of the post-mortem application for benefits under the Group Plan, EBD began to process a request for both disability benefits and the death benefit under the Group plan.

On May 26, 1987, while the application submitted by Boeing on plaintiff's behalf for benefits under the Group Plan was still pending, Aetna's PFSD paid Carolyn Rosile the face amount of the death benefit under the individual conversion policy ($119,250) plus interest on this amount ($1,401), a total of $120,651. This payment was made because of the age of the claim and on the understanding that EBD would reimburse PFSD if there ultimately was determined to be coverage under the Group Plan, in which event PFSD also would refund to Carolyn Rosile the premiums paid for the individual conversion policy.

EDB subsequently determined that coverage existed under the Group Plan. On or about September 4, 1987, as a consequence of Boeing's post-mortem application, Aetna's EBD paid Carolyn Rosile $3,003.33 in total and permanent disability benefits under the Group Plan for the period from the date that Frank J. Rosile first became disabled under the terms of the Group Plan, November 16, 1986, until the date of his death.

On September 2, 1987, EDB also mailed to Boeing a draft payable to Carolyn Rosile in the amount of $122,610.24. This draft represented the death benefit under the Group Plan, plus interest. According to the defendants, this draft was issued by mistake. EBD should have reimbursed PFSD for its prior payment to Carolyn

---

5. On April 6, 1987, the defendants had submitted an application for a determination of coverage on behalf of the Rosiles. The plaintiff contends that she did not make an application under the Group Plan because Fager had informed the Rosiles that upon Frank Rosile's retirement, coverage under the Group Plan would be lost forever.

6. Although Carolyn Rosile submitted a claim for death benefits under policy number N3871104 on an ALIAC claim form, the death benefit paid Carolyn Rosile under Policy number N3871104 was paid by Aetna, not ALIAC.

Rosile under the individual conversion policy, rather than pay another death benefit to Carolyn Rosile. The plaintiff contends that no mistake was made and that she is entitled to death benefits under the Group Policy.

On September 8, 1987, Carolyn Rosile came to Boeing's office to claim the $122,-610.24 draft. Boeing's employees learned that she already had received a death benefit under the individual conversion policy and refused to give her the second draft. Boeing subsequently returned the draft to Aetna at its request.

In October 1987, Aetna's EBD did reimburse the PFSD for its May 26, 1987 payment to Carolyn Rosile. The check reimbursing the PFSD was payable to Aetna. On November 19, 1987, PFSD tendered to Carolyn Rosile a draft representing a refund of the premiums that the Rosiles paid for the individual conversion policy, but Carolyn Rosile has refused to cash or deposit this draft.

By letter dated November 25, 1987, Carolyn Rosile requested a copy of the Group Plan from Ken Barton at Boeing. On December 10, 1987, Ken Barton, Boeing's Administrator—Group Insurance, mailed to Carolyn Rosile a copy of the Group Plan. According to Carolyn Rosile, she immediately mailed a copy of the package she had received to an attorney whom she already had retained in connection with this matter.

At some point after December 10, 1987, Carolyn Rosile or her attorney concluded that the copy of the Group Plan forwarded by Barton was missing one page. Carolyn Rosile wrote Barton again requesting another complete copy of the Group Plan and a copy of the individual conversion policy. Carolyn Rosile's letter was dated January 5, 1988, but she admits that this date may have been wrong and that, in fact, she may have sent the letter in January 1989.

In any event, on January 13, 1989, Barton responded to Carolyn Rosile's letter, advising her that Aetna would be sending her the policies. On February 10, 1989, Steven LeBrun and Laura Topazio of Aetna both wrote to Carolyn Rosile, enclosing copies of the two policies. Carolyn Rosile had never bothered to read the provisions of the Group Plan. In her deposition, Carolyn Rosile testified that any harm she may have suffered by reason of any delay on the Administrator's part in providing her with copies of the policies was "speculative."

Standards for Summary Judgment

■ Summary judgment is appropriate when the movant can demonstrate that there is no genuine issue of material fact and is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Fed.R.Civ.P. 56(c). Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson,* 477 U.S. at 251–52, 106 S.Ct. at 2511–12.

■ An issue of fact is "genuine" if the evidence is significantly probative or more than merely colorable such that a jury could reasonably return a verdict for the nonmoving party. *Id.* at 248, 106 S.Ct. at 2510. An issue of fact is "material" if proof thereof might affect the outcome of the lawsuit as assessed from the controlling substantive law. *Id.* at 249, 106 S.Ct. at 2510–11. Factual inferences are drawn to favor the existence of triable issues, and where reasonable minds could ultimately reach different conclusions, summary judgment is appropriate. *See Riley v. Brown & Root, Inc.,* 896 F.2d 474, 476–77 (10th Cir.1990).

ERISA

In *Pension Benefit Guaranty Corp. v. Gray & Co.,* 467 U.S. 717, 104 S.Ct. 2709, 81 L.Ed.2d 601 (1984), the Supreme Court discussed the legislative history of ERISA:

In 1974, after careful study of private retirement pension plans, Congress enacted the employee Retirement Income Security Act (ERISA), 88 Stat 829, 29 USC § 1001 et seq. [29 USCS §§ 1001 et

seq.] Among the principal purposes of this "comprehensive and reticulated statute" was to ensure that employees and their beneficiaries would not be deprived of anticipated retirement benefits by the determination of pension plans before sufficient funds have been accumulated in the plans. *Nachman Corp. v. Pension Benefit Guaranty Corp.* 446 US 359, 361–362, 374–375, 64 L Ed 2d 354, 100 S Ct 1723 [1732–33] (1980). See *Alessi v. Raybestos-Manhattan, Inc.* 451 US 504, 510–511, 68 L Ed 2d 402, 101 S Ct 1895 [1899–1900] (1981). Congress wanted to guarantee that "if a worker has been promised a defined pension benefit upon retirement—and if he has fulfilled whatever conditions are required to obtain a vested benefit—he actually will receive it." *Nachman*, supra, [446 U.S.] at 375, 64 L Ed 2d 354, 100 S Ct 1723 [at 1733]; *Alessi*, supra [451 U.S.] at 510, 68 L Ed 2d 402, 101 S Ct 1895 [at 1899–1900].

467 U.S. at 720, 104 S.Ct. at 2713. In short, ERISA was promulgated "to protect contractually defined benefits ..." *Massachusetts Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 148, 105 S.Ct. 3085, 3093, 87 L.Ed.2d 96 (1985). In *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 108, 109 S.Ct. 948, 952–53, 103 L.Ed.2d 80 (1989), the Supreme Court commented that "Erisa provides 'a panaploly of remedial devices' for participants and beneficiaries of benefit plans." (quoting *Massachusetts Mutual Life Ins.*, 473 U.S. at 146, 105 S.Ct. at 3092.) *See* 29 U.S.C. § 1001 (Congressional findings and declaration of policy).

### Plaintiff's Claim for Benefits

Rosile claims she is entitled to benefits under the Group Plan. At the outset, the defendants contend that because Rosile can only recover from the plan itself under this particular claim, the only proper party to this claim is the Group Plan. The plaintiff does not respond to this contention. Therefore, the court construes this claim to be asserted only against the Group Plan itself.

*See Gelardi v. Pertec Computer Corporation*, 761 F.2d 1323, 1324–25 (9th Cir.1985); 29 U.S.C. § 1132(d)(2).

■ The sole issue presented by this claim is whether, under the terms of the Group Plan, Carolyn Rosile is entitled to a death benefit under the Group Plan notwithstanding the fact that she has received a benefit under the individual conversion policy. The defendants acknowledge that Frank Rosile could have made a request for a determination under the Group Plan that he was totally and permanently disabled and could have been reinstated under the Group Plan. The defendants contend however that recovery of the death benefit under the individual conversion policy contractually bars recovery of a death benefit under the Group Plan.

The court concludes that recovery of life insurance benefits under the Group Plan and the individual conversion policy are mutually exclusive. The application for an individual policy that Frank Rosile signed on August 20, 1986, provided that "issuance of the policy applied for shall be exchanged for all privileges and benefits with respect to the full amount of term insurance on [Frank Rosile's] life under the Group Policy." The Group Plan provided that when an individual policy is issued under the conversion option "it shall be in exchange for all privileges and benefits under the group policy." If Frank Rosile had made a "written request to the Insurance Company to make a determination of such total and permanent disability" he could have been reinstated under the Group Plan at that time provided that he surrendered his individual conversion policy "without any claim other than for return of any premium paid ..."

Notwithstanding these unambiguous contractual provisions, the plaintiff contends that she is nevertheless entitled to a second death benefit under the Group Plan.[7] The plaintiff contends that "Aetna Life Insurance and Annuity Corporation's alleged mistake in paying Mrs. Rosile benefits un-

---

**7.** For whatever reason, the plaintiff does not endeavor to specifically analyze the relevant provisions of the Group Plan and the applica-

tion for conversion policy but merely asserts that the provisions cited by the defendant "have no application to this controversy."

der the Individual Policy does not excuse defendants from paying benefits to Mrs. Rosile under the Group Policy."

In advancing this argument, the plaintiff places great reliance on *Hoffa v. Fitzsimmons,* 499 F.Supp. 357 (D.D.C.1980), *aff'd in part, vacated in part on other grounds,* 673 F.2d 1345 (D.C.Cir.1982).[8] According to the plaintiff, *Hoffa* stands for the proposition that the "plan cannot withhold benefits which the plan has determined the beneficiary is entitled to even if the plan subsequently discovers that a mistake was made in calculating the amount of benefit owed." Relying on *Hoffa* and other cases, the plaintiff concludes that "[t]he law is clear that when Aetna determined and notified Mrs. Rosile that she was entitled to the Group Policy benefits, Aetna was absolutely bound under ERISA to pay those vested benefits to her."

Greatly simplified, in *Hoffa,* Josephine Hoffa, as administratrix of her husband, James R. Hoffa,[9] former president of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, brought an action against the trustee and administrators of a pension plan for breaching an agreement to pay a lump-sum benefit. Under the terms of the pension plan, a beneficiary in Hoffa's position had the unilateral option of taking his retirement benefits in one of two ways: he could either receive a lifetime annuity or a lump-sum payment. Hoffa opted for the lump sum benefit and a written agreement reflecting the understanding of the parties was agreed upon. 673 F.2d at 1349.

When Hoffa's representatives attempted to recover under the agreement (the agreement was separate, but related to the pension plan), the trustees denied that the sum agreed to be paid was correct and attempted to avoid the effect of the agreement on the basis of mutual mistake (and several other defenses). The court of appeals concluded, *inter alia,* that "this case fits with the narrow range of situations in which trustees and beneficiaries are permitted to specify contractually the respective duties and rights arising under the trust." 673 F.2d at 1353. Notwithstanding several defenses asserted by the defendants, the court enforced the agreement.

*Hoffa* is not direct support of the plaintiff's case as it is factually distinguishable. A fair reading of the case does not support the broad proposition for which the plaintiff asserts. Moreover, any contractual right the plaintiff had to the funds she seeks were relinquished in the application for the individual conversion policy. In any event, *Hoffa* is not binding precedent on this court. *See Davidian v. Southern Meat Cutters Union,* 859 F.2d 134, 136 n. 2 (9th Cir.1988) (declining to follow *Hoffa.*) The court has also reviewed each of the other cases cited by the plaintiff. None of those cases are particularly instructive in the case at bar as the plaintiff in each of those cases had a clear right to the benefits under the terms of the pension plan, but the defendants refused, for unjustifiable reasons, to withhold benefits. *See, e.g., Vink v. S.H.V. North America Holdings Corp.,* 549 F.Supp. 268 (S.D.N.Y.1982) (ERISA prevents forfeiture of employee benefits under "bad boy" clauses). In the case at bar, the plaintiff has not seriously attempted to demonstrate how she is entitled to a second death benefit under the express terms of the Group Plan and the individual conversion policy.

As the defendants suggest, the underlying but unstated premise of this claim by the plaintiff is based upon an estoppel-type argument. Basically, the plaintiff's position is that even if she is not entitled to a second death benefit under the express

---

**8.** The court notes that the defendants, in analyzing *Hoffa,* have incorrectly identified headnote number 4, written by West Publishing Co., as the syllabus of the court. The headnotes supplied by West are not part of the court's decision and should not be cited as statements of law. *See Lewis v. East Feliciana Parish School Board,* 635 F.Supp. 296, 299 n. 8 (M.D.La.1986), *aff'd* 820 F.2d 143 (5th Cir.1987) (headnote forms no

part of the opinion). The headnotes are only included to summarize the court's decision and place the decision in the key number system so that the decision can hypothetically be located at a later time.

**9.** James Hoffa disappeared on or about July 30, 1975.

terms of the plan and conversion agreement, the defendants' original (mistaken) determination that she was eligible for a death benefit under the Group Plan essentially estops the defendants from refusing to pay the second death benefit.[10]

■ In *Straub v. Western Union Telegraph Co.*, 851 F.2d 1262, 1265 (10th Cir.1988), the court of appeals held "that no liability exists under ERISA for purported oral modification of the terms of an employee benefit plan." (Citing *Nachwalter v. Christie*, 805 F.2d 956, 959–61 (11th Cir.1986)).[11] Nor can the common law doctrine of estoppel be used to alter this result. *Id.* In *Hozier v. Midwest Fasteners, Inc.*, 908 F.2d 1155 (3rd Cir.1990) the court of appeals commented:

> To some extent, plaintiffs might be suggesting that defendants' post-formation practices are significant not only because they shed light on the intended scope of the entitlement as originally created, but also because they could expand the scope of previously created entitlement under an estoppel theory. However, we agree with *Nachwalter* and his progeny that an employer's post-formation promises to increase benefits, whether explicit and oral or implicit through custom, cannot alter the scope of entitlements created by a plan that must, under governing law, be "established and main-

tained" pursuant to a written instrument, ERISA § 401(a)(1), 29 U.S.C. § 1102(a)(1). *See Supra* Part III(A). Any argument to the contrary, such as the one recently made in *Black v. TIC Investment Corp.*, 900 F.2d 112 (7th Cir. 1990), depends on the presupposition that the availability of estoppel in ERISA cases "is not so much a question of statutory interpretation as a question of public policy," *id.* at 114, which we reject.

Nothing in this footnote is meant to suggest that estoppel is *never* available in ERISA cases. To the contrary, in *Rosen v. Hotel & Restaurant Employees & Bartenders Union*, 637 F.2d 592 (3d Cir.1981), we permitted a participant to estop a pension fund from denying benefits on the basis of a plan provision mandating that certain contributions to the plan be made by the employer, not the employee. When the employer fell behind on the requisite contributions, thus jeopardizing the employee's pension, the employee sought to make, and did make, the contributions himself. On those facts, we allowed the use of estoppel. As we noted, the case involved "more than mere assurances" by the trustee, who also "deposited [the employee's] monies into the Fund's account." *Id.* at 598. Thus, *Rosen* "can be classified as one of the 'extraordinary circumstances' as outlined in [prior ERISA

---

**10.** The plaintiff contends that when Aetna concluded that she was entitled to a death benefit under the Group Policy her rights to that benefit "vested." The term "vested" in this context generally refers to the passage of time and years of service necessary to "vest" the employee's right to benefits. *See, e.g., Pratt v. Petroleum Prod. Mngmt. Employee Sav. Plan*, 920 F.2d 651, 659–61 (10th Cir.1991); 29 U.S.C. § 1053 (vesting of pension plans). None of the cases cited by the plaintiff directly support her contention that Aetna's mistaken determination that she was entitled to a death benefit created a "vested" right to those funds. The plaintiff has not attempted to identify any provision in the Group Policy which would support such a proposition. Moreover, had the EBD actually given Carolyn Rosile the draft for the second death benefit, the defendants could conceivably have precovered that money under the doctrine of restitution. *See Naugle v. O'Connell*, 833 F.2d 1391, 1397–98 (10th Cir.1987) (restitution appropriate remedy

for trustee's erroneous payments made on basis of mistake of fact).

**11.** The Eleventh Circuit has further clarified the scope of *Nachwalter*. *See National Companies Health P. v. St. Joseph's Hosp.*, 929 F.2d 1558, 1571–74 (11th Cir.1991) (discussing clarification of *Nachwalter*). In *Kane v. Aetna Life Ins.*, 893 F.2d 1283 (11th Cir.), *cert. denied*, — U.S. —, 111 S.Ct. 232, 112 L.Ed.2d 192 (1990), the Eleventh Circuit held that the federal common-law claims of equitable estoppel may be applied when an employee relies, to his detriment, on an interpretation of an ambiguous provision in a plan by a representative of that plan. 893 F.2d at 1286. Even assuming that the Tenth Circuit would adopt the Eleventh Circuit's analysis, this exception to the general rule is inapplicable to the case at bar as the plan is unambiguous, nor is it clear that the plaintiff could satisfy each of the elements of estoppel, if she had expressly made that argument.

cases limiting the use of estoppel to extraordinary circumstances]." *Id.*

We find no such "extraordinary circumstances" colorably present in this record. The most plaintiffs could allege is that defendants' practice of paying benefits to certain employees after the consolidation had been completed constituted an implied representation to all other employees that such benefits would continue to be provided, the scope of the original plan not withstanding. We conclude that in these circumstances, entertaining a judicially created estoppel claim cannot be reconciled with section 402(a)(1) of ERISA.

908 F.2d at 1165 n. 10. *But see Black v. TIC Investment Corp.,* 900 F.2d 112, 115 (7th Cir.1990) (estoppel principles are applicable to claims for benefits under unfunded single-employee welfare benefit plans under ERISA).

In short, because the express terms of the plan precludes the recovery of two death benefits, the plaintiff is not entitled to a second death benefit.

### Fiduciary Duty Claims

The plaintiff contends that the defendants are liable to her for their alleged breach of fiduciary duty under 29 U.S.C. § 1109(a). The plaintiff contends that the defendants' misrepresentations concerning plan benefits available to her husband under the Group Policy constitutes a breach of fiduciary duty. The plaintiff also contends that she was paid life insurance benefits by Aetna Life Insurance and Annuity Corporation under the individual policy. The plaintiff contends that Aetna then determined she was also covered under the Group Policy. Aetna not only wrongfully refused to pay her under the Group Policy, but used those benefits due her under the Group Policy to "reimburse" Aetna Life Insurance & Annuity Corporation for its "alleged erroneous payment of life insurance benefits to plaintiff under the Individual Policy."

■ In regard to the plaintiff's first claim of breach of fiduciary duty, the defendants deny that they have ever misrepresented what benefits were available under the Group Plan.[12] The defendants contend that, even assuming the plaintiff's version of the facts concerning the "misrepresentations" is true, they are entitled to summary judgment as she has not advanced a cognizable claim under § 1109(a). Specifically, the defendants contend that any of the duties breached were duties owed to the plan; instead she is merely asserting breaches of fiduciary duty to herself. Because she does not allege (and cannot prove) that the plan has been damaged, the defendants contend they are entitled to summary judgment on her first breach of fiduciary duty claim.

As to the plaintiff's contention that Aetna has impermissibly made a transfer of her benefits to ALIAC, the defendants deny that ALIAC paid the plaintiff benefits under the individual policy. The defendants contend that upon learning that Carolyn Rosile had already received a death benefit under the individual conversion policy, that the funds were transferred internally within Aetna. The defendants contend that such a ministerial act was not a violation of any fiduciary duty owed to the Group Plan. The defendants contend that "[p]laintiff's suggestion to the contrary is pure nonsense and simply reflects her desire to capitalize on a mistake made within Aetna's corporate divisions to obtain a windfall in clear contravention of the terms of the Group Plan."

29 U.S.C. § 1109(a) provides:

(a) Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to

12. The defendants contend that the plaintiff's breach of fiduciary duty claims cannot be properly asserted against the Group Plan, citing *Mertens v. Kaiser Steel Retirement Plan,* 744 F.Supp. 917, 924 (N.D.Cal.1990) ("Since a section 409 action is one for a breach of the fiduciary's duty to the plan, the plan, if a party at all, is properly a defendant"). The plaintiff does not respond to this argument.

such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

In *Massachusetts Mutual Life* the Supreme Court concluded that 29 U.S.C. § 1109(a) does not give an individual beneficiary or participant a private cause of action for "extracontractual damages caused by improper or untimely processing of benefit claims." 473 U.S. at 148, 105 S.Ct. at 3093. "Although plaintiffs may maintain an action for breach of fiduciary duty arising from the insurer's processing of a claim, the remedies available do not 'give rise to private right of action for compensatory or punitive relief.'" *Davis v. John Alden Life Ins. Co.*, 746 F.Supp. 44, 49 n. 5 (D.Kan.1990) (quoting *Massachusetts Mutual Life*, 473 U.S. at 144, 105 S.Ct. at 3091). Recovery for a violation of 29 U.S.C. § 1109(a) inures to the benefit of the plan as a whole. *See Davis v. Kentucky Finance Cos. Retirement Plan*, 887 F.2d 689, 696 (6th Cir.1989), *cert. denied*, —— U.S. ——, 110 S.Ct. 1924, 109 L.Ed.2d 288 (1990); *Davis*, 746 F.Supp. at 49 n. 5 (plaintiffs' allegations seeking extracontractual relief for breach of fiduciary duty fail to state a claim). The court has considered the relief that plaintiff suggests is appropriate for the alleged violation of § 1109(a).[13] As the defendants suggest, the plaintiff's claims do not appear to restore any benefit to the Group Plan; this claim is merely an alternative means to recover benefits inuring solely to the benefit of the plaintiff. Plaintiff's breach of fiduciary duty allegations fail to state a claim upon which relief can be granted.

■ Even if plaintiff's fiduciary duty claims somehow benefitted the plan, the plaintiff still encounters at least one other fatal snag. The plaintiff contends that she was erroneously informed that her husband's benefits under the Group Policy would "terminate forever" upon his retirement. Assuming this statement is true, the only damage which the plaintiff suffered was payment of premiums for the individual policy (which would have been unnecessary if Frank Rosile was still covered under the Group Policy).[14] The defendants have already refunded those premiums to the plaintiff. Putting aside for a moment that the plan has not suffered any damages, it is clear that the plaintiff has not been damaged either, as she has not been denied any benefit to which she was entitled under the express terms of the Group Plan. Nor would other participants have suffered any harm had they been "misinformed" by the defendants; there is no evidence, other than Carolyn Rosile's own speculation, that any other participant has been harmed by the defendants' "misinformation."[15]

13. In plaintiff's partial motion for summary judgment the plaintiff contends:

In this case, Aetna has voluntarily transferred Mrs. Rosile's plan benefits (amounting to $119,250) to its sister corporation, Aetna Life Insurance and Annuity Corporation. Aetna should, therefore, be required to restore the $119,250 to the plan plus all applicable interest earned to which could have been earned on said amount. Furthermore, since Aetna admits that Mrs. Rosile is entitled to and her rights have vested with respect to the $119,250 of life insurance benefits under the Group Policy, once Aetna has restored this money to the plan, the plan must be required to pay said benefits to Mrs. Rosile. *See* 29 U.S.C. § 1132(a)(1)(B) (Supp.1990).

14. While unnecessary to the court's decision, the court notes that the defendants, at worst, recommended the most conservative option available to the Rosiles; i.e. the option that guaranteed *continued* life insurance coverage. It appears, and the plaintiff seemingly acknowledges (see page 10 of the pretrial order) that had Frank Rosile not converted to an individual policy, there may have been a short time where he was not covered by any life insurance.

15. The plaintiff directs the court's attention to *Gors v. Venoy Palmer Market, Inc.*, 578 F.Supp. 365 (E.D.Mich.1984), in support of her contention that a misrepresentation of plan benefits to an individual participant gives rise to a breach of fiduciary duty claim under ERISA. That case is distinguishable as that case involved a claim that representations in the summary plan description were false. That summary description, disseminated to all participants, erroneously informed participants that only five years of service were necessary to "vest" benefits, when in reality ten years were required to vest benefits. On the basis of that misrepresentation, the

As to the plaintiff's contention that the Group Plan has suffered from a transfer of funds from Aetna to ALIAC, the court is satisfied that the affidavits submitted are based on personal knowledge, do not conflict internally or with other affidavits, and are not inconsistent with the discovery materials. Based upon the affidavits and discovery materials, it is clear that (1) PFSD administers individual life insurance policies for both Aetna and ALIAC; (2) The individual conversion policy issued to Frank Rosile (N3871104) was issued by Aetna, not ALIAC; (3) The death benefit paid to plaintiff under the individual conversion policy was paid by Aetna, not ALIAC; and Aetna reimbursed itself, not ALIAC, for the death benefit paid under the individual conversion policy. Therefore the defendants have not violated their fiduciary duty.[16]

The defendants are entitled to summary judgment on the plaintiff's breach of fiduciary duty claims.

### 29 U.S.C. § 1132(c)

The plaintiff claims that she is entitled to statutory penalties under 29 U.S.C. § 1132(c). Specifically, the plaintiff contends that the defendants failed or refused to supply her with a complete copy of the Group Policy in a timely manner and that because of that non-compliance the defendants are liable for $100 per day penalty.

 The defendants[17] respond that they are entitled to summary judgment on this claim. The defendants do not admit that they failed to timely honor the plaintiff's requests for copies of the two policies in this case. The defendants contend that even if they did not technically comply § 1132(c), the court, in its discretion, should deny statutory penalties under the particular facts and circumstances of this case.

29 U.S.C. § 1132(c) currently provides:

(1) Any administrator (A) who fails to meet the requirements of paragraph (1) or (4) of section 101(e)(1) [29 USCS § 1166(1) or (4) or § 1021(e)(1)] with respect to a participant or beneficiary, or (B) who fails or refuses to comply with a request for any information which such administrator is required by this title to furnish to a participant or beneficiary (unless such failure to refusal results from matters reasonably beyond the control of the administrator) by mailing the material requested to the last known address of the requesting participant or beneficiary within 30 days after such request may in the court's discretion be personally liable to such participant or beneficiary in the amount of up to $100 a day from the date of such failure or refusal, and the court may in its discretion order such other relief as it deems proper.

The determination of liability and amount of liability for violations of 29 U.S.C.

---

plaintiff terminated his employment after five years. Under those circumstances, the plaintiff presented a viable breach of fiduciary duty cause of action under ERISA.

The *Gors* case is distinguishable as the plaintiff in that case was clearly damaged; in the case at bar, the only financial damages which the plaintiff has arguably suffered are the payments for the individual conversion policy, which have already been returned to the plaintiff.

**16.** The plaintiff's memorandum in support of her motion for partial summary judgment directs the courts attention to *United States v. Ramirez–Amaya*, 812 F.2d 813 (2d Cir.1987), followed by the phrase "(a fiduciary breaches his § 1104 duty to a plan participant by preventing or interfering with the receipt of benefits to which the participant is entitled)". *Ramirez–Amaya* is a criminal cocaine case. The case immediately preceding *Ramirez–Amaya, Blatt v. Marshall and Lassman*, 812 F.2d 810, 813 (2d

Cir.1987), does stand for the proposition which the plaintiff parenthetically suggests. In any event, because the defendants have not withheld any benefit to which the plaintiff is entitled, they have not placed their own interests above those of the plaintiff.

**17.** While the defendants have not raised this argument, the court notes that "[t]he court is precluded from extending liability under section 1132(c) to persons not identified by Congress." *Bass v. Prudential Ins. Co. of America,* 764 F.Supp. 1436, 1441 (D.Kan.1991). In *Bass,* Chief Judge O'Connor granted summary judgment as to the plaintiff's allegations of 29 U.S.C. § 1132(c)(1) to a defendant who was not the "administrator" of the plan as defined by 29 U.S.C. § 1002(16)(A)(i).

In the pretrial order, the plaintiff only identifies defendants The Welfare Benefits Plan Committee and Aetna as "administrators" within the meaning of ERISA.

§ 1132(c) is committed to the sound discretion of the district court. *Lesman v. Ransburg Corp.,* 719 F.Supp. 619, 621–22 (W.D.Mich.1989), *aff'd,* 911 F.2d 732 (6th Cir.1990); 29 U.S.C. § 1132(c)(1). "[E]ven where ERISA violations are undisputed damages are not automatically awarded." 719 F.Supp. at 621. "Although prejudice is not a prerequisite for the imposition of nondisclosure penalties under 29 U.S.C. § 1132(c) courts properly may consider detrimental reliance or prejudice before imposing penalties under 29 U.S.C. § 1132(c)." 719 F.Supp. at 622.

The court does not condone the administrators' apparent failure to supply Rosile with a complete copy of the policies she requested. Rosile was obviously entitled to a complete copy of the Group Policy. Nevertheless, the court, in the exercise of its discretion, concludes that under the facts and circumstances of this case the imposition of statutory penalties is inappropriate. Despite the plaintiff's protestations, it does not appear that she has been prejudiced or damaged. The court grants the defendants' motion for summary judgment on the plaintiff's 29 U.S.C. § 1132(c)(1) claims.

### 29 U.S.C. § 1106

On pages 12–13 of the plaintiff's reply brief on her motion for partial summary judgment (Dk. 56), the plaintiff attempts to preserve her claim of a violation of 29 U.S.C. § 1106. The plaintiff apparently abandoned that claim in her third amended complaint based upon her reading of discovery responses.

The plaintiff's attempt to reserve this claim in her reply brief is unavailing. More importantly, the pretrial order does not attempt to reserve this issue.

IT IS THEREFORE ORDERED that the defendants' motion for summary judgment (Dk. 43) is granted.

IT IS FURTHER ORDERED that the plaintiff's motion for partial summary judgment (Dk. 45) is denied.